FILED
CLERKS OFFICE
2005 OCT 31  P 4:16
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11217-NG

|  |  |
|---|---|
| James Ferland, | ) |
| Plaintiff Pro Se, | ) |
|  | ) |
| v. | ) |
|  | ) |
| Superintendent Paul Norton, Deputy | ) |
| Kenneth Silva, Captain Kevin Slattery, and | ) |
| Officer Jack Crowley, | ) |
| Defendants. | ) |

This motion is brought pursuant to the provisions of F. R. Civ. P 56 & Local Rule 56.1

## MIDDLESEX SHERIFF DEFENDANTS' MOTION TO STRIKE AND TO DISMISS PLAINTIFF'S COMPLAINT

Now come the Defendants Superintendent Paul Norton, Deputy Kenneth Silva,

Captain Kevin Slattery and Officer James Crowley (collectively referred to as the

"Defendants") and move to strike and to dismiss Plaintiff's amended complaint pursuant

to F. R. Civ. P 12, 15 & 56 and Local Rule 56.1.

In furtherance of the Defendants' motions to strike and to dismiss, the Defendants

state the following:

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS ON THEIR MOTION TO STRIKE AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT

1. Plaintiff, who is a pro se prisoner in the custody of the Middlesex Sheriff's Office, commenced this action alleging that Defendants violated his constitutional rights. See Federal Summons & Complaint.

2. On November 30, 2004, Plaintiff received a sentence of incarceration from the Middlesex Superior Court to be served at the Billerica House of Correction ("BHOC"). See Complaint, paragraph 4

3.  Plaintiff claims that upon his commitment, he was placed in Cell I-4 of the Billerica "New Man" unit where the conditions of his confinement were supposedly less than ideal. See Complaint, paragraph 5.

4.  Plaintiff filed no institutional grievances with respect to these supposedly poor conditions of confinement.

5.  Although Plaintiff identifies no specific date in his complaint, institutional records reveal that on December 1, 2004 at approximately 2:50 p.m., Defendant Deputy Kenneth Silva instructed correctional officer Edward Conley to search Cell I-4. See Disciplinary Reports & Complaint, paragraph 8.

6.  As a result of the search of Plaintiff's cell, Officer Conley found two (2) small "rock-like" substances that appeared to be crack cocaine. See Disciplinary Reports & Complaint, paragraph 9.

7.  When informed of the discovery of the items, Plaintiff denied ownership or possession of the substance. See Complaint, paragraph 10.

8.  Having determined that the discovery of these substances in Cell I-4 constituted possession of contraband, Plaintiff was removed from his cell and strip-searched pursuant to departmental policy. See Middlesex Sheriff's Office Policy & Procedure 506 (Searches), p. 3, paragraph 3.[1]

9.  On December 2, 2004, Defendants ordered Plaintiff to provide a urine sample pursuant to departmental policy. See Complaint, paragraph 11 & Policy 525H.[2]

10. Later that day, Inmate Ferland's urine sample tested positive for the presence of marijuana. See Plaintiff's Urine Test results dated December 2, 2004.

11. Defendant knew that his urine sample tested positive for marijuana as early as December 3, 2004. See Plaintiff's Appeal from Disciplinary Detention Unit ("DDU") Sentences.

12. As to the cocaine, the urine results registered "-34" which meant that even though the reading was negative it was high enough to indicate that

---

[1] Middlesex Sheriff's Office Policy & Procedure 506 defines contraband as "any item not approved for retention by an inmate."

[2] "It is the policy of the Middlesex Sheriff's Office that all inmates committed to the Billerica House of Correction shall be subject, both randomly and for cause, to urine surveillance for the purpose of detecting the use of drugs." P & P 525H, p. 2.

2

Plaintiff had ingested cocaine within the last twenty-four (24) to seventy-two (72) hours.  See Plaintiff's Urine Test results dated December 2, 2004.

13. Following the search of his person, Plaintiff was placed in the DDU pending a disciplinary hearing on institutional charge # 25 ("[p]ossession of anything, including money or currency not authorized for retention or receipt by the inmate") and charge # 36 ("[v]iolating any law of the Commonwealth of Massachusetts or the United States of America").  See Middlesex Sheriff's Office's BHOC Inmate Handbook, p. 14.

14. According to the Defendants' policy 423H, DDU "is a form of separation from the general population in which inmates *committing serious rule violations are, by decision of a disciplinary officer,* confined to cells separate from the general population and whose privileges are restricted for a finite period of time." (Emphasis supplied).

15. The Defendants predicated institutional charge # 36 on the violation of Chapter 94C because Plaintiff's urine test result was positive for the presence of marijuana.[3]

16. On December 2, 2004, Defendants notified Plaintiff that his disciplinary hearing would be conducted on December 3, 2004.  See Notice of Disciplinary Hearing & Complaint, paragraphs 12-14.

17. On December 3, 2004, the Defendants' Disciplinary Board (apparently comprised of Officer Crowley and Captain Slattery) found Plaintiff guilty on both charges.  See Record of Disciplinary hearing and Notice of Findings dated December 3, 2004.

18. Consequently, Inmate Ferland received two (2) consecutive ten (10) day sentences to the DDU.  See Record of Disciplinary hearing and Notice of Findings dated December 3, 2004 & Complaint, paragraph 16.

19. On December 7, 2004, the Defendants submitted the "rock-like" substance to the State Police Crime Lab in Sudbury, Massachusetts for analysis.  See Narcotic Custody Form.

20. Days before Plaintiff's release from the DDU, Defendants classified Ferland to the Administrative Segregation Unit.  See Deputy Peter Bolton's Notice of Temporary Assignment from DDU to the Administrative Segregation dated December 20, 2004.

_____

[3] Marijuana is a Class D controlled substance under G. L. c. 94C, §§ 31 & 34.

21.    According to the terms of Policy 423H, Administrative Segregation is a
designated housing area for the separation of inmates from the general
population who are temporarily segregated by order of a Shift Commander
when the inmate's presence in general population poses a threat to the
institution.[4]

22.    Defendants deemed "[Plaintiff's] continued presence in the general
population pose[d] a serious threat to life, property, yourself, staff or other
inmates, or to the security or orderly running of this facility." See Deputy
Peter Bolton's Notice of Temporary Assignment from DDU to the
Administrative Segregation dated December 20, 2004.

23.    Discovery of the substances was a serious breach of institutional security.

24.    Deputy Silva attested to past instances where inmates had distributed
counterfeit substances to other prisoners leading to dangerous
consequences for inmates and fellow officers.[5]

25.    On January 12, 2005, Defendant Superintendent Paul Norton approved
Plaintiff's classification from the Special Management's Administrative
Segregation Unit back into the general population. See Segregation
Classification Form dated January 12, 2005.

26.    On February 7, 2005, the Crime Lab testing revealed that the "rock-like"
substances found in Plaintiff's cell were negative for cocaine. See Drug
Certification dated February 9, 2005.

27.    Despite, the negative results on the "rock-like" substances, the Defendants
possessed independent and permissible evidence" to support charge # 36
because Plaintiff's urine test was positive for marijuana. See Puleio v.
Commissioner of Correction, 52 Mass. App. Ct. 302, 310 (2001).

28.    From these facts, Plaintiff asserted that his confinement to the DDU and
reclassification to the Administrative Segregation Unit caused him
"emotional stress"; violated his due process rights; and was per se
"unconstitutional". See Complaint, paragraphs 18 & 21-26.

29.    Plaintiff prayed to this Honorable Court for remedies at law (monetary
compensation in the amount of $ 500.00 per day for each alleged day of
wrongful confinement) and in equity (injunction to "curtail the defendant
from transferring the plaintiff to any other jail" or from retaliatory action).

---

[4] Despite Inmate Ferland's classification to Administrative Segregation, he remained in the same cell and
unit that housed the Administrative Segregation and Protective Custody Units.

[5] According to Deputy Silva's affidavit, a fake drug is also known as a "beat rock" because the inmates
who purchase these substances feel tricked or "beaten" by the dealer.

4

A.        ARGUMENT

I.        Defendants' motion to strike Plaintiff's amended complaint must be
         allowed because the proposed amendment would be futile and because
         Plaintiff failed to obtain judicial leave to file the amended complaint
         pursuant to F. R. Civ. P 15

As a threshold matter, Defendants reiterate the principle found in Mmoe v. Com.,

393 Mass. 617, 620 (1985) that although some leniency is appropriate in determining

whether a pro se complaint meets the requirements of the Rules of Civil Procedure, the

rules bind pro se litigants as they bind other litigants. There is no judicial obligation to

protect a pro se defendant from his lack of legal training. Com. v. Jackson, 419 Mass.

716, 721 (1995).

Accordingly, Plaintiff's complaint must "stand or fall on [its] own [merit]"

without substantial revision by the Court. Mmoe v. Com., 393 Mass. at 620 (court may

not "recast" prisoner complaint in a form that corresponds to the judge's view of what

claims the prisoner intended but failed adequately to set forth).

"Futility constitutes an adequate basis to deny a proposed amendment." Savoy v.

White, 139 F.R.D. 265, 267 (1st Cir. 1991). Based on the reasons stated herein,

Defendants' F. R. Civ. P 12 (f) motion to strike must be allowed. Although discussed

extensively below, for purposes of the Rule 12 (f) and 15 issues, Plaintiff is legally

constrained from challenging his classification to Administrative Segregation on due

process grounds. See Sowell v. Fair, 1990 U.S. App. LEXIS 17616 (1990) (prisoner has

no constitutional right to remain in particular classification because transfer is at the

discretion of the prison superintendent); see also Sandin v. Conner, 515 U.S. 472, 478

(1995) (Massachusetts law allows prison officials discretion to transfer prisoners to alternate facilities for "*whatever reason or for no reason at all*"). (Emphasis supplied).

Further authorities cited below clearly buttress the Defendants' position that classification decisions are not reviewable because they are deemed "a simple exercise of [the Superintendent's] administrative discretion." Dougan v. Commissioner of Correction, 34 Mass.App.Ct. 147, 150 (1993); see also Martin v. Scott, 156 F. 3d 578, 580 (5th Cir. 1998) (absent extraordinary circumstances, administrative segregation being an incident to the ordinary life of a prisoner will never be a ground for constitutional claims because it does not involve liberty interest).

Furthermore, Plaintiff's complaint fails to state a claim against the Defendants for the ten (10) days that he spent in the DDU on Charge # 36 because that particular confinement did not create sufficient liberty interests to be actionable under § 1983. See Sandin v. Conner, 515 U.S. at 431 (prisoner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might create a liberty interest).

As to the amended complaint, Plaintiff served it on Defendants who did not actually receive a copy of the pleading until October 19, 2005. Plaintiff's amended complaint which sought to add individual claims against the Defendants violated F. R. Civ. P 15 because it was served after the Defendants filed their Answer. In such cases, the Plaintiff was required to obtain leave of Court. See F. R. Civ. P 15 (a). Plaintiff failed to comply with Rule 15 so his amended complaint should be stricken.

Based on these reasons, the Defendants' motion to strike and motion to dismiss Plaintiff's amended complaint must be allowed.

II.     As discussed above, Defendants' motion to dismiss must be allowed
        because Plaintiff's detention in the DDU and Administrative Segregation
        did not involve federally protected liberty interests

The facts of this case are consonant with the facts in Puleio v. Commissioner of

Correction, 52 Mass. App. Ct. at 302. In that case, a pro se prisoner filed an action in the

nature of certiorari alleging, among other things, that correctional officers deprived him

of his constitutional rights with respect to his disciplinary hearings based on the

prisoner's possession of contraband (piece of wire solder). Ibid. at 303.

The Court in Puleio dismissed the prisoner's G. L. c. 249, § 4 petition because it

found that prison officials had legitimate penological reasons for imposing the

disciplinary sanctions against the inmate for possessing the contraband. 52 Mass.App.

Ct. at 310. Here, Plaintiff misrepresented in his complaint that he had violated "no

institutional policies" when in fact he had. On December 2, 2004, Plaintiff was given

advance written notice of the disciplinary charges. O'Malley v. Sheriff of Worcester

County, 415 Mass. 132, 138 (1993). At the hearing, Plaintiff was given an opportunity to

call witnesses or to present evidence. Ibid.

After the hearing, Defendants provided Plaintiff with written notice of his guilty

findings for violating the aforementioned institutional rules. Plaintiff had been housed in

Cell I-4 since November 30, 2004 and the contraband was discovered the next day

"wrapped in plastic in the corner of the bottom shelf." See Disciplinary Reports. While

admittedly not an extensive period of time, it was still a sufficient period of time to

satisfy the legal definition of constructive possession. Puleio v. Commissioner of

Correction, 52 Mass.App.Ct. at 306 (knowledge and control over contraband can be

inferred from discovery of contraband in inmate's cell); see also Sowell v. Fair, 1990

U.S. App. LEXIS 17616, (due process is satisfied where "some evidence" supports prison disciplinary board's decision).

The first disciplinary rule was violated by Plaintiff simply being found in possession of the rock-like substance. The disciplinary second rule was violating the laws of the Commonwealth or the United States. Although the Summary of Findings notes the rock-like substances, Plaintiff ignores the fact that he knew at the time of his disciplinary hearing that his urine sample tested positive for marijuana. Thus, Defendants still "possessed independent and permissible evidence of guilt." Puleio v. Commissioner of Correction, 52 Mass.App.Ct. at 310.

Furthermore, Inmate Ferland's consecutive ten (10) day sentences to the DDU did not constitute an infringement of his due process liberty interests because his conditions of confinement in the DDU did not give rise to "atypical, significant deprivations in relation to ordinary incidents of prison life." Ibid. As for Plaintiff's classification to Administrative Segregation following his DDU sentences, Plaintiff's complaint fails to state a claim. See O'Malley v. Sheriff of Worcester County, 415 Mass. at 136 (administrative segregation does not involve a federally protected liberty interest because it is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration).

It is well-established that classification decisions do not require proof of serious misconduct or the occurrence of specific events because the decision to transfer a prisoner is a simple exercise of the Superintendent's administrative discretion. Dougan v. Commissioner of Correction, 34 Mass.App.Ct. at 150 (freedom from transfer is not a "liberty interest" since an inmate may be transferred at the whim of the Commissioner).

Additionally, state regulations pertaining to classification do not require decisions be based on "substantial evidence" but can be based simply on a written summary of the classification board's recommendations to the superintendent. Ibid. Thus, the time that Plaintiff spent detained in Administrative Segregation is not subject to review based on Policy 423H, Deputy Bolton's *Notice of Temporary Assignment* letter, Deputy Silva's affidavit testimony and the cases cited herein. To the extent that Plaintiff seeks judicial review of his "21 days" of confinement in Administrative Segregation, the authorities expressly hold otherwise.

Notwithstanding the disparate forms of classification involved in this case, Plaintiff's complaint must also be dismissed because he produced no evidence that his "disciplinary sanctions had been expunged or invalidated in other judicial or administrative proceedings." Puleio v. Commissioner of Correction, 52 Mass.App.Ct. at 309. Plaintiff mistakenly contended that the "drug charges" were dropped apparently referring to the Crime Lab's February 2005 analysis. In paragraphs # # 16 & 21 of the complaint, Plaintiff stated that "[t]he mere contention that it 'appeared to be drugs' should have been followed by due process and the security team should of (sic) been given the investigation."

Yet Plaintiff has produced no evidence beyond mere speculation that the Defendants had indeed "dropped" charge # 36. Regardless of the negative drug analysis, the Defendants still possessed "independent and permissible" evidence based on Plaintiff's positive urine test for marijuana and the discovery of the contraband in Cell I-4 to support the guilty findings. Puleio v. Commissioner of Correction, 52 Mass.App.Ct. at

310. Plaintiff knew of the urine test results at the time of the hearing. See Plaintiff's
Appeal of DDU Sentence dated 12/3/04.

Plaintiff has pointed to no prejudice he allegedly suffered under these
circumstances because "[t]he mere fact that...no disciplinary action was taken with
respect to [other contraband] does not alter the fact that [the inmate's] possession
of...contraband was a violation of the regulations for which he could be punished." Ibid.

Based on the foregoing arguments and authorities, Defendants' motion to dismiss
must be allowed.

III.    Should this Honorable Court deny Plaintiff's amendment for the reasons
        stated above, Defendants' motion to dismiss Plaintiff's civil rights and
        emotional distress claims must be allowed because the Defendants, who
        were sued in their official capacities, are immune from suit pursuant to
        the 11th Amendment and G. L. c. 258, § 10 (c)

Plaintiff's complaint alleges that Defendants violated his constitutional rights by
improperly detaining him in the DDU and later in the Administrative Segregation Unit.
As a result of that so-called wrongful detention, Plaintiff claimed to have suffered
"emotional stress." Complaint, paragraph 24.[6] In the original complaint, Plaintiff sued
Superintendent Norton as the "senior jail official in his professional capacity as the
supervisory administrator..." See Complaint, paragraph 2. Furthermore, he sued Deputy
Kenneth Silva, Captain Slattery and Jack Crowley "as they were parties to the
disciplinary tribunal." See Complaint, paragraph 3.

The Defendants in this action were state employees acting within the scope of
their duties. Thus, when Plaintiff originally named the Defendants in their official

---

[6] Although Plaintiff's complaint is silent as to whether the emotional stress was negligent or intentional, the
negligent infliction of emotional distress claim would be barred nonetheless pursuant to G. L. c. 258, § 2
(public employer not named in suit) and § 4 (lack of presentment).

capacities, the Defendants were deemed to be the functional equivalent of the "state." Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989) (11th Amendment provides that a suit against a state official in his official capacity is not a suit against the official but rather is a suit against the official's office).

Plaintiff's complaint must be dismissed because he sued the Defendants in their official capacities. Public employees are not "persons" liable under § 1983 and the MCRA for civil rights violations. See Will v. Michigan Department of State Police, 491 U.S. at 66 (a state is not a "person" which is subject to suit under § 1983, regardless of whether the suit is brought in federal or state court); see also Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71, 76 (1992) (the Commonwealth is not a "person" for purposes of G. L. c. 12, §§ 11H and 11I).

In addition to the fact that the Commonwealth is not a "person" subject to suit for civil rights violations, Plaintiff failed to prove the additional requirement set forth in the state statute that the Defendants' actions had deprived him of either a constitutional right or any other right by "threats, intimidation or coercion." Sarvis v. Boston Safe Deposit and Trust Company, 47 Mass.App.Ct. 86, 91 (1999). The record is absolutely devoid of any proof of the requisite "threats, intimidation or coercion." Puleio v. Commissioner of Correction, 52 Mass.App.Ct. at 313 (disciplining a prisoner for valid security reason does not violate MCRA).

Furthermore, G. L. c. 258, § 10 (c) specifically excludes from the provisions of the Massachusetts Tort Claims Act ("MTCA") "any claim arising out of an intentional tort, including...false imprisonment...intentional mental distress..." See Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509, 528-535 (1998). Given

that Plaintiff sued each Defendant here in their official capacities for emotional stress and civil rights violations, Defendants are insulated from liability. See Spring v. Geriatric Authority of Holyoke, 394 Mass. 274, 285 (1985) (public employers retain their immunity from suits arising from intentional torts).

Based on the foregoing arguments and authorities, Defendants' motion to dismiss must be allowed.

V.    Plaintiff's action must be dismissed to the extent that it seeks monetary damages against the Defendants in their official capacities

If a state official is sued in his official capacity, then the plaintiffs' recovery is limited to equitable relief only. See O'Malley v. Sheriff of Worcester County, 415 Mass. at 141 (monetary damages against state officials are available only if they are sued in their individual or personal capacities for actions under color of state law). In this case, like in O'Malley, nothing in the record indicates that the Defendants were sued in their individual or personal capacities. Ibid. Moreover, as mentioned above, the complaint is devoid of any reference to the Defendants other than in their official capacities.

Accordingly, Plaintiff's complaint must be dismissed to the extent it seeks monetary damages against the Defendants in their official capacities.

Respectfully submitted,
Middlesex Defendants,
By their attorney,

Steven J. Masse, Jr.
Middlesex Sheriff's Office
40 Thorndike Street, 17th FL.
Cambridge, MA 02141
Dated: October 31, 2005        (617) 494-4400, ext. 4494

12

## **CERTIFICATE OF SERVICE**

I, Steven J. Masse, Jr., hereby certify that I have served the foregoing document upon Inmate James Ferland, c/o Billerica House of Correction, 269 Treble Cove Road, Billerica, MA by first-class mail.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11217-NG

| | |
|---|---|
| James M. Ferland,<br>Pro Se Plaintiff,<br><br>v.<br><br>Superintendent Paul Norton, Deputy Kenneth<br>Silva, Captain Kevin Slattery and Officer James<br>Crowley,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF MIDDLESEX DEPUTY KENNETH SILVA

I, Kenneth Silva, do hereby depose and state the following upon my personal knowledge and under the pains and penalties of perjury:

1. I am a deputy employed by the Middlesex Sheriff's Office.

2. I have held this position since July 3, 1983.

3. In November 2004, I was assigned to the Billerica House of Correction as the Deputy of the special management unit.

4. On December 1, 2004, at approximately 2:50 p.m., I instructed Officer Edward Conley to search or "shake down" cell (Cell I-4) then being occupied by Inmate James Ferland.

5. During the search of the Plaintiff's cell, 2 small "rock like" substances were discovered.

6. At the time, I believed that the unknown items were Class B controlled substances namely crack cocaine.

7. Upon notification of the discovery, I ordered Plaintiff to be strip-searched in accordance with department policy and placed in the Disciplinary Detention Unit ("DDU").

8. I also had reasonable grounds under my agency's policies to order Plaintiff to submit a urine sample which he did on December 2, 2004.

9.    Plaintiff's urine test came back positive for marijuana and "-34" for the cocaine which meant that Plaintiff had used cocaine within the last 24 to 72 hours.

10.   I charged Plaintiff with violating Middlesex Sheriff's Office Inmate Handbook infraction # 25 **"[p]ossession of anything, including money or currency not authorized for retention or receipt by the inmate"** because even though the "rock like" substances later tested negative for cocaine, Plaintiff's possession of the substance constituted contraband.

11.   Contraband is forbidden under the department's rules and regulations.

12.   Following receipt of the urine test results, I also charged him with disciplinary Infraction # 36 **"[v]iolating any law of the Commonwealth of Massachusetts or the United States of America"** based on the urine test results which showed that Plaintiff was in violation of Chapter 94C by having marijuana and traces of cocaine in his system.

13.   On December 3, 2004, the Prison's Disciplinary Board found Plaintiff guilty of both infractions and sentenced him to consecutive 10 day sentences in the DDU.

14.   On December 20, 2004, the institution determined that Plaintiff was a threat to the security of the prison based on Plaintiff's possession of the "rock like" substances.

15.   Even without knowing the results of the drug analysis, I have personal knowledge of instances where inmates have sold substances to other prisoners that they claim were drugs when in fact the substance was counterfeit.

16.   A fake crack rock is known in prison as a "beat rock" because the inmates who purchase the fake drugs feel tricked or "beaten" by the dealer.

17.   This type of scenario creates a very dangerous "climate" issue for correctional officers because the prisoner who was deceived and/or his cohorts will seek revenge against the inmate dealer and could cause a riot or violent disturbance in the process.

18.   Based on my personal knowledge and all the circumstances of this case, Plaintiff was classified to the Administrative Segregation Unit on December 20, 2004 according to departmental policy 423H.

*SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY,*

Deputy Kenneth Silva

Dated: October 12, 2005                    Middlesex Sheriff's Office

## MIDDLESEX COUNTY - OFFICE OF SHERIFF

### APPEAL FORM

INMATE: *JAMES FERLAND* I.D.#: *106900* DATE: *12-3-04*

DISCIPLINARY REPORT #: _____

If you wish to appeal the finding(s) or sanction(s) regarding the disposition of the Disciplinary Report identified above, complete this form and submit it to the Superintendent/designee within seven (7) days of receipt of the hearing results.

- [ ] There was not substantial compliance with the Disciplinary guidelines.
- [X] The decision was not based on substantial evidence.
- [ ] The sanction(s) was not proportionate to the offense.
- [ ] Other

INDICATE IN THE SPACE BELOW THE SPECIFIC GROUNDS FOR YOUR APPEAL

I AM WRITING TO YOU IN THE HOPE THAT YOU MODIFY THE SANCTIONS THAT WERE GIVEN TO ME. FIRST OF ALL HOW CAN I BE FOUND GUILTY WHEN DEPUTY SILVA TOLD ME THAT THE EVIDENCE HAD BEEN SENT TO THE STATE POLICE LAB TO SEE IF IT WAS REAL THAT'S LIKE GOING TO COURT AND THE JUDGE CONVICING AND SENTENCING YOU BEFORE HE SEES ANY EVIDENCE. SECOND I VOLUNTARILY ASKED TO TAKE A URINE WHICH CAME BACK NEGATIVE FOR COCAINE. LAST I AM 43 YEARS OLD AND I HAD MY 25 YEAR OLD BROTHER DIE FROM THAT SHIT. ALSO HOW AM I BREAKING RULE#36 IF THE DEPUTY WAS NOT SURE IT WAS EVEN REAL

*James Ferland* _____ *12-3-04*
INMATE'S SIGNATURE               DATE

- [X] UPHOLD DECISION OF DISCIPLINARY HEARING
- [ ] MODIFY DECISION OF DISCIPLINARY HEARING: _____

_____ *12-23-04*
SUPERINTENDENT/DESIGNEE          DATE

R0042

*..ddlesex Sheriff's Office*
Segregation Classification

INMATE: _FERUND, JAMES_    #: _106800_

DATE: _1/12/05_ TYPE:    Initial    (Review)

DATE ADMITTED TO UNIT: _12/20/04_

HOW ADMITTED:    (Segregation Notice)

Completed Disciplinary Sanction

CURRENT STATUS LEVEL    I    II    (III)    N/A

COMMENTS: _____

_____

## RECOMMENDATION OF CLASSIFICATION COMMITTEE

(Return to the general population)

Classify/Remain in Administrative Segregation

## INDIVIDUAL SERVICE PLAN

Level I        Level II        Level III

Requirements: _____

_____

## BOARD MEMBERS

_Off Williams_    _Sop Silva_    _Ofc Bresnahan_

## DECISION OF SUPERINTENDENT

(Approve)    Modify    Deny    APPROVED

Comments: _____

_Gaul Epstein_    _1/12/05_
Superintendent    Date

## Middlesex Sheriff's Office
### Segregation Classification

INMATE: Ferland, James      #: 106900

DATE: 1/5/05    TYPE: ☐ Initial    (☑ Review)

DATE ADMITTED TO UNIT: 12/20/05

HOW ADMITTED:      ☑ Segregation Notice

☑ Completed Disciplinary Sanction

CURRENT STATUS LEVEL   ☐ I   ☑ II   ☐ III   ☐ N/A

COMMENTS: _____

_____

### RECOMMENDATION OF CLASSIFICATION COMMITTEE

☐ Return to the general population

☑ Classify/Remain in Administrative Segregation

### INDIVIDUAL SERVICE PLAN

☐ Level I    ☐ Level II    ☑ Level III          Vote: 3/0

Requirements: _____

_____

### BOARD MEMBERS

S. Howes, Deputy Silva, C/o Crawley

### DECISION OF SUPERINTENDENT

☑ Approve    ☐ Modify    ☐ Deny

Comments: _____

Paul E. White _____    1-6-05

Superintendent                           Date

# MIDDLESEX HOUSE OF CORRECTION
## SEGREGATION BOARD APPEAL

To:     Superintendent Paul Norton

From:   JAMES FERLAND         INS#106900

Subject:   Appeal of Segregation Board's Decision

Date:   12-22-04

---

I, JAMES FERLAND , would like to appeal the

( Inmate Name )

decision of the Segregation Board, made on 12-22-04 .

(Date)

Thank you for your time and consideration in this matter.

### Additional information

I AM ASKING TO PLEASE RECONSIDER MY LEVEL
STATUS. I HAVE BEEN IN SEG. FOR 22 DAYS NOW
I WOULD LIKE TO BE PUT ON LEVEL 2 SO THAT
I CAN AT LEAST CALL MY FAMILY ON THE PHONE.

---

### Decision of Superintendent

APPEAL DENIED

APPEAL UPHELD

Reason(s): LEVEL II

Superintendent's Signature          Date  1-3-05

## Return to: Classification Department

*Middlesex Sheriff's Offi.*
Segregation Classification

(I-13)

INMATE: __Ferland, James__        #: __106900__

DATE: __12/29/04__  TYPE:  Initial    (Review)

DATE ADMITTED TO UNIT: _____12/20/04_____

HOW ADMITTED:        Segregation Notice

                                    ✓Completed Disciplinary Sanction

CURRENT STATUS LEVEL  (I)   II    III    N/A

COMMENTS: _____

_____

## RECOMMENDATION OF CLASSIFICATION COMMITTEE

Return to the general population

Classify/Remain in Administrative Segregation

## INDIVIDUAL SERVICE PLAN

Level I    (Level II)    Level III       Vote: 3/0

Requirements: _____

_____

## BOARD MEMBERS

S/o Howes, Deputy Silva, c/o Crowley

## DECISION OF SUPERINTENDENT

(Approve)    Modify    Deny

Comments: _____

_____    __12/30/04__
         Superintendent                       Date

*Middlesex Sheriff's Office*
Segregation Classification

INMATE: Ferland, James          #: 106900

DATE: 12/21/04   TYPE: (✓Initial)   Review   LIB

DATE ADMITTED TO UNIT: 12/20/04

HOW ADMITTED:        ✓Segregation Notice

                     ✓Completed Disciplinary Sanction

CURRENT STATUS LEVEL    I    II    III    N/A

COMMENTS: _____

_____

## RECOMMENDATION OF CLASSIFICATION COMMITTEE

Return to the general population

Classify/Remain in Administrative Segregation

## INDIVIDUAL SERVICE PLAN

Level I        Level II        Level III       Vote: 3/0

Requirements: _____

BOARD MEMBERS
S/o Howes, , Deputy Silva, c/o Morrissey

## DECISION OF SUPERINTENDENT

Approve      Modify      Deny

Comments: _____

_____           12/23/04
Superintendent                         Date

*Middlesex Sheriff's Office*

## NOTICE OF TEMPORARY ASSIGNMENT TO ADMINISTRATIVE SEGREGATION

TO:     - James Ferland                          106900

NAME OF INMATE                              INSNO.

FROM:    A.D.S. Peter Bolton

DATE:    December 20, 2004

You have been temporarily classified to the Administrative Segregation Unit as your continued presence in the general population may pose a serious threat to life, property, yourself, staff or other inmates, or to the security or orderly running of this facility.

A hearing will be held within 3 days (excluding weekends and holidays) to determine if you will remain in segregation or return to the general population. You will be asked to be present at this hearing.

If it is decided that you are to remain in segregation, your status will be reviewed weekly and you will be provided with an individual plan that you will need to follow in order to be returned to the general population.

*I have personally delivered a copy of this notice to the inmate named above on the following date and time.*

| PRINT NAME | SIGNATURE | DATE | TIME | ☑ a.m. ☐ p.m. |
|---|---|---|---|---|
| Capt. Slattke | Capt. Roth | 12/20/04 | 8:45 | |

cc:   Superintendent
      Assistant Superintendent
      Deputy Superintendent
      Director of Classification
      Segregation Unit Manager
      Segregation Folder

Notice of Temporary Assignment to Administrative Segregation (3/2001)

# The Commonwealth of Massachusetts
## Middlesex Sheriff's Office

### DISCIPLINARY REPORT

---

*TO BE COMPLETED BY THE DISCIPLINARY OFFICE*

Major: _____ Minor: _____ Report #: _____ Date: _____

Disciplinary Officer: _____

FACILITY: Billerica _ . _
UNIT: Main Building
CODES: 25,36

---

INMATE:    Ferland,        James                    I. D. #:  106900

### DESCRIPTION OF OFFENSE:

On 12-1-04 at approx. 2:50 p.m. Deputy Silva asked me to shakedown cell I-4. The inmate who occupies this cell is James Ferland #106900. The inmate was searched before he left the cell and then escorted to the shower room. During the search of this cell two small "rock's" that appeared to be crack cocain,were wraped in plastic were found in the corner of the bottom shelf. This evidence was given to Deputy Silva and inmate Ferland was escorted to seg.

_____
Signature of Reporting Officer

12/1/04 3:19 PM
Date and Time Reported

_____
Name of the Reporting Officer

Inmate Placed on Lock-in Status?    Yes: ✓    No:    Unit: DOU
Copy of Report Served to the Inmate?    Yes: ✓
Informal Action Taken by Supervisor:

_____
(Supervisor's Signature)

12/1/04
Date

Created on 01/30/04 10:22 AMD-report

# MIDDLESEX COUNY - OFFICE OF SHERIFF

## NOTICE OF DISCIPLINARY HEARING

TO: (INMATE): _Ferland James_    I.D.#: _106800_

RE: DISCIPLINARY REPORT #: _____    CHARGES(S): _25, 36_

You have been charged with the above disciplinary charge(s) (Code of Offenses) which have been referred to the Disciplinary Board for a hearing. The charge(s) (Code of Offenses) are listed on the reverse side of this notice, and a description of the offense(s) charged are contained in the attached Disciplinary Report.

A hearing on this Disciplinary Report will be held on _12/3/04_ at approximately _10_ AM/PM.* You will be asked to appear before the Disciplinary Board at that time, however, you may waive your right to be present at the Hearing.

If you wish to be assisted by a staff member, to call witnesses, or to waive your right to appear at the Disciplinary Board Hearing, complete the relevant section(s) of the attached Request for Staff Assistance and/or Witness - Waiver of Hearing form and forward it to the Disciplinary Officer prior to the end of the day.

I have personally delivered a copy of this notice with the referenced Disciplinary Report and a Request for Staff Assistance and/or Witness - Waiver of Hearing form attached to the inmate identified above:

_____
Signature

_Kenneth Silva_
Printed Name

_12/2/04_          _10 A_
Date               Time

* Note: The actual scheduling of the hearing may be delayed if circumstances require; however, you will have at least twenty-four (24) hours notice prior to the actual hearing.

BC158

# MIRANDA WARNING

The following warning and questions shall be read/asked prior to questioning any inmate regarding any matter for which the inmate may be criminally charged. In the event that the inmate states he does not wish to speak to the matter, the inmate shall not be asked or compelled to answer any questions. Additionally, if the inmate initially states that he does wish to speak to the matter

1.    You have the right to remain silent.    ✓

2.    Anything you say may be used against you in a court of law.    ✓

3.    You have the right to have an attorney present during any questioning.    ✓

4.    If you wish to speak to an attorney, but cannot afford one, one will be appointed to your before any questioning.    ✓

Do you understand each of these rights I have read to you?    YES    NO

With these rights in mind, do you wish to speak to us now without an attorney present?    YES    NO

INMATE'S NAME: _Ferland  Jones_    COMMITMENT #: _10690_

DATE: _12/2/04_

PREPARED BY: _Dep. Knott_

WITNESSED BY: _____



James V. DiPaola
Sheriff

# The Commonwealth of Massachusetts
## Middlesex Sheriff's Office
## Disciplinary Hearing
## Summary

INMATE: Ferland, James 106900

FINDING(S):
GUILTY:            25,36
NOT GUILTY:
DISMISSED:

SANCTION(S) AND RECOMMENDATION(S):
1.    25, 10days c/r
2.    36, 10days c/r
3.
4.
5.

EVIDENCE RELIED UPON TO SUPPORT FINDINGS:

| X | Disciplinary Report |
|---|---|
|  | Witness Testimony |
|  | Witness Statement(s) |
|  | Reporting Staff Member's Testimony |
|  | Other (describe): Two rocks submitted as evidence |

REASON FOR SANCTION(S) AND RECOMMENDATION(S):
Time to reflect on choices you have made

The inmate has been advised of the Disciplinary Board's decision, appeal procedures, and a copy of this document and an Appeal Form has been provided to the inmate.

_____          December 3, 2004          10am
Staff Signature                         Date                     Time

Hearing Officer: _____          December 3, 2004
                          Signature                              Date

DisciplinaryBoardFindings.doc 8/27/03

*Commonwealth of Massachusetts*
*Middlesex Sheriff's Office*

*Record of Disciplinary Hearing and Notice of Findings*

| | | | | | |
|---|---|---|---|---|---|
| Name of Inmate: | Ferland,james | INSNO: | 106900 | | |
| Disc. Report Number: | | Hearing Date: | 12/03/04 | Time: | 10am |

*Check List*

1.  Was the inmate given at least 24 hours notice of his hearing? Yes X  No ☐  If no, include waiver with record.
2.  Was the inmate present before the Board? Yes X  No ☐  If no include waiver.
3.  Was the inmate advised of his right to remain silent? Yes  No  If yes, include Miranda Warning Record.
4.  Did the inmate request staff assistance? Yes ☐  No X  If yes, who assisted? _____
5.  Did the inmate request the presence of an Advisory Board Member? Yes X  No ☐
6.  Did the inmate request to:
    -  Make a statement? Yes X  No ☐
    -  Call witnesses? Yes ☐  No X
    -  Present other evidence? Yes ☐  No X
7.  Was the inmate advised of his right to appeal? YesX No ☐

*Pleas and Findings*

Plea:    Not Guilty X    Guilty

Finding:    Not Guilty ☐    Guilty X    Dismissed: ☐

*Summary of Evidence*

Evidence Relied upon to Support Findings

X Disciplinary Report          ☐ Reporting Officer's Testimony
 Inmate's Testimony            ☐ Other:    PHYSICAL EVIDENCE 2 ROCKS
☐ Testimony of Witnesses       _____

Summary of statement by inmate:    I SEARCHED THE ROOM I DIDN'T CHECK THERE
_____
_____

Summary of testimony and other evidence (use additional sheet if necessary): _____
_____
_____
_____
_____

If any testimony or other evidence was excluded or if witnesses requested by the accused were not heard, list below stating the reasons for exclusion: _____

_____

_____

_____

*Sanctions*

Sanctions for Each Offense:

| Offense: | Sanction: |
|----------|-----------|
| 25 | 10 DAYS C/R |
| 36 | 10 DAYS C/R |

State the reasons why these sanctions were imposed:         TIME TO REFLECT ON YOUR DRUG
                                                             USE

_____

_____

Signature of Hearing Officer:    _Jack Crowly_____

                    Date:    December 3, 2004_____

*The Commonwealth of Massachusetts*
*Middlesex Sheriff's Office*
*Communication Report*

**To:** Deputy Bolton

**From:** C/O Martin

**Date:** December 2, 2004

**Subj:** Urine Tests

---

On 12/02/04 I tested 1 urine sample from the segregation unit. That sample belonged to inmate James Ferland #106900. His sample was positive for marijuana. His sample also showed a reading of −34 for cocaine. This indicates that inmate Ferland had recently used cocaine. Since cocaine typically remains in one's system 24 to 72 hours, it is likely inmate Ferland used cocaine within the last day or two.

INSTITUTIONAL
DRUG TEST
RESULTS.
POSITIVE - Pot
HIGH READING Coke

_____ 12-2-04
Staff Signature

_____
Shift Commander/Supervisor

# LOWELL COMMUNITY COUNSELING CENTER
291 SUMMER ST.
LOWELL, MA. 01852
PHONE: (978) 458-4973
FAX: (978) 458-4975

## Donor Detail Report

Donor ID:     106900                                    Start Test Date:  9/30/04

Donor Name:FERLAND, JAMES                               End Test Date:   7/26/05

| Accession: | 57778 | Date Collected: | 12/01/04 | Agency: | HOC | | POSITIVE |
|---|---|---|---|---|---|---|---|
| Control Number: | | Time Collected: | 12:26 | Sub Agency: | M/B | | |
| Test Date: | 12/02/04 | Collected by: | | Requesting Party: UK | | | |

| | Test Code | Result | Reference | Flag |
|---|---|---|---|---|
| | AMPH | -103 | 0 | NEGATIVE |
| | BARB | -109 | 0 | NEGATIVE |
| | BENZ | -143 | 0 | NEGATIVE |
| | COCN | -34 | 0 | NEGATIVE |
| | OPIA | -113 | 0 | NEGATIVE |
| | THC50 | 97 | 0 | POSITIVE |
| | CREA | 141.9 | 20 | NEGATIVE |

| Accession: | 60955 | Date Collected: | 2/23/05 | Agency: | HOC | | NEGATIVE |
|---|---|---|---|---|---|---|---|
| Control Number: | | Time Collected: | 12:24 | Sub Agency: | M/B | | |
| Test Date: | 2/24/05 | Collected by: | | Requesting Party: UK | | | |

| | Test Code | Result | Reference | Flag |
|---|---|---|---|---|
| | AMPH | -94 | 0 | NEGATIVE |
| | BARB | -92 | 0 | NEGATIVE |
| | BENZ | -129 | 0 | NEGATIVE |
| | COCN | -100 | 0 | NEGATIVE |
| | OPIA | -106 | 0 | NEGATIVE |
| | THC50 | -53 | 0 | NEGATIVE |
| | CREA | 58.2 | 20 | NEGATIVE |

Total number of accessions:     2

Total Positive:     1

Positive Percent:     50.00

\*\*\* End of Report \*\*\*



*The Commonwealth of Massachusetts*

*Department of State Police*

*Crime Laboratory*

*59 Horse Pond Road*

*Sudbury, Massachusetts 01776*

*Telephone (508) 358-3110 Facsimile (508) 358-3111*

**MITT ROMNEY**
*GOVERNOR*

**KERRY HEALEY**
*LIEUTENANT GOVERNOR*

**EDWARD A. FLYNN**
*SECRETARY*

**COLONEL THOMAS G. ROBBINS**
*SUPERINTENDENT*

| | | | |
|---|---|---|---|
| **Laboratory Case Number:** | 04-12297 | **Date:** | February 7, 2005 |
| **Defendant or Suspect:** | James M. Ferland | **Agency Case Number:** | 106900BH2 |
| **Agency:** | Billerica House of Correction  (BH2) | | |

---

I hereby certify that the:        0.45 grams of yellow "rock" powder in the two (2) knotted plastic bags

Contained in the:        plastic evidence bag

Submitted to the laboratory for:    Officer Edward Conley

Date submitted to the laboratory:   December 7, 2004

**Has been examined by me with the following results:**

No Controlled Substances were detected.   Also submitted were one Disciplinary report, one paper cup and one piece of paper.

Nancy W. Brooks
Chemist

NWB:ast

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.
Nancy W. Brooks, whom I know to be a Chemist of the Massachusetts Department of State Police Crime Laboratory, appeared
before me and affirmed the above to be the results made on Laboratory Number 04-12297.

Sworn and subscribed to before me on this    9th    day of    February    2005.

CAROLINE A. TATRO
Notary Public
Commonwealth of Massachusetts
My Commission Expires
February 3, 2006

Caroline A. Tatro
Notary Public

Chapter 22C, Section 39
A certificate by a chemist of the department of the result of an analysis made by him of a drug furnished him by a police officer of the
department, signed and sworn to by such chemist, shall be prima facie evidence of the composition, quality, and weight of such drug.

*Excellence In Service Through Quality Policing*

## Narcotic Custody Form

*The Commonwealth of Massachusetts*
State Police Crime Laborator
Evidence Unit:  508/358-3155
Drug Unit:      508/358-3164

**04-12297**

Sudbury Crime Laboratory

| Submitting Unit Name: BH2 | Drug Submission Number: BH2 | |
|---|---|---|
| Case Officer: EDWARD CONLEY | | Agency Case Number: 106900 BH2 |
| Subject(1): JAMES M. FERLAND | | Address(1): 34 ARROWHEAD ROAD Bellingham, MA. |
| DOB: 11/20/61 | SSN#: 039386735 | |
| Subject(2): | | Address(2): |

Case Type:   ☐ Purchase   ☑ Seizure   ☐ Discovery   ☐ Other _____

Date of Incident: 12/1/04   Time of Incident: 2:50 PM   Place of Incident: Cell I-4 B Mod A tier of Cell

Description of seized drugs, articles, implements, and/or paraphernalia:

Two small rock like items off white in color. Each package separate by in tied off baggie corner.

| Date | Submitted by Whom (signature & printed name) | Delivered to Where (printed location) | Delivered to Whom (signature) |
|---|---|---|---|
| 12/7/04 | _____ ID # __ | S.P. Drug Lab Sudbury | _____ |
| | ID # | | |
| | ID # | | |
| | ID # | | |
| | ID # | | |
| | ID # | | |

Authorization for Disposition of Drugs: In accordance with Chapter 94C Section 47A of the General Laws, drugs, articles, implements, and/or paraphernalia, pertaining to the above defendant are hereby ordered to be delivered to the Department Of Public Health for destruction or disposition in any way not prohibited by law.

| Court: | Date: | Signature of Justice/Clerk: |
|---|---|---|
| Disposition: | | |

SP295 (8/02)    White/Original    Yellow/Submitting Agency    Pink/Crime Laboratory    Gold/Submitting Officer



*The Commonwealth of Massachusetts*
*Middlesex Sheriff's Office*

1.

James V. DiPaola
Sheriff

## Policy and Procedure 423H

## Special Management Unit

### Table of Contents

.01     Date Revised
.02     Standards Referenced
.03     Policy
.04     Applicability
.05     Definitions
.06     Management
.07     Selection of Staff
.08     Inspection
.09     Health Care Services
.10     Cell Contents
.11     Daily Operational Procedures
.12     Reporting Requirements
.13     Administrative Segregation Unit (AdSeg)
.14     Disciplinary Detention Unit (DDU)
.15     Protective Custody Unit (PC)
.16     Orientation Unit
.17     Jail Unit

#### .01    Date Revised

The revision date of this policy is October 14, 2003.

#### .02    DOC and ACA Standards Referenced

This policy is consistent with 103 CMR 924.02, 926.01 through 926.04, 936.03(5) and Adult Local Detention Facility standards 3-ALDF-3D-01 through 3-ALDF-3D-06 and 3 ALDF-3D-08 through 3-ALDF-3D-11.

### .03    Policy

1. It is the policy of the Middlesex Sheriff's Office to provide for the special management of Billerica House of Correction inmates classified as administrative segregation, disciplinary detention, protective custody, new commitments and awaiting trial. The Office shall provide housing for such inmates separate from the general population. When authorized by the Superintendent or Assistant Superintendent, special management inmates may be confined to a cell in general population. The Special Management Unit shall be administered in accordance with this policy and procedure which shall govern the supervision of SMU inmates and shall provide for the following:

    a. the management of inmates including inspections and reporting

    b. the placement, review and release process for SMU inmates

    c. the selection criteria, supervision, and assignment of staff who are assigned to work with special management inmates

    d. the programs and services offered to SMU inmates

    e. access to caseworkers and

    f. the removal of any item or activity normally available.

2. Performance evaluations of staff assigned who work with special management inmates shall be provided by Policy and Procedure 242 - Employee Evaluations. (Cannot identify in P&P 242 where this is outlined)

### .04    Applicability

This policy applies to the Billerica House of Correction.

### .05    Definitions

As used in this policy, the following words shall have the following meanings:

1. Classification Committee -. The authorized committee which is responsible for classifying inmates to Administrative Segregation or Protective Custody, conducting the initial segregation hearing and the

weekly review of each inmate so classified and for monitoring the inmate's progress within the unit.

The Classification Committee shall consist of at least three members as follows:

    a.    The Director of Classification or designee

    b.    The Director of Human Services or designee and

    c.    The Assistant Superintendent of Operations or designee.

2.    <u>Disciplinary Detention</u> - A form of separation from the general population in which inmates committing serious rule violations are, by decision of a disciplinary officer, confined to cells separate from the general population and whose privileges are restricted for a finite period of time.

3.    <u>Administrative Segregation Unit</u> - A designated housing area for the separation of inmates from the general population who are classified as Administrative Segregation, or who are temporarily segregated from the general population by order of a Shift Commander when their presence in general population poses a serious threat to self, staff or other inmates or to the security of the facility.

4.    <u>Protective Custody (PC)</u> - A form of separation from the general population for inmates who are classified as protective custody by the Classification Committee when such separation is necessary to protect them from other inmates.

5.    <u>Jail Unit</u> - A designated housing area for the separation of inmates not sentenced but held in lieu of bail to await trial.

6.    <u>Orientation Unit</u> - A designated housing area for the separation of newly committed inmates from the general population for the purpose of orientation and initial classification.

## .06   **Management**

The facility has established a Special Management Unit (SMU) within the facility to house designated inmates apart from general population. The SMU consists of 5 sub-units: the Administrative Segregation; Protective Custody; Disciplinary Detention; Jail Unit and the Orientation Unit.

The Assistant Superintendent for Operations shall be responsible for the operation of the SMU and shall appoint a Special Unit Manager to manage the daily operation of the unit.

**.07    Selection of Staff**

1.    The requirements for assignment as an Officer in Charge of a Special Management Unit shall include, but not be limited to following requirements:

    a.    a minimum of 2 years of satisfactory service as a line correctional officer

    b.    a minimum of 1 year of such service within a medium security unit or the Cambridge Jail and

    c.    training in use of force and restraint equipment.

2.    When assigning other officers to the SMU, the Shift Commander will, to the extent possible, apply these standards to these temporary selections and assign the same utility officers on a consistent basis.

3.    The selection of health services, human services and classification staff to the SMU shall, to the extent possible, require the assignment of experienced staff members.

**.08    Inspection**

1.    The Unit Manager shall visit each sub-unit of the SMU at least once on each workday.

2.    The Shift Commander or a designated supervisor shall visit each sub-unit of the SMU at least once on each shift.

3.    Health Services staff members shall visit each sub-unit of the SMU at least daily.

4.    All such visits as specified above shall be documented in the appropriate unit logbooks.

**.09    Health Care Services**

The full range of health care available to general population shall be available to all in inmates in each sub-unit of the SMU. These services are provided as follows:

1.    Routine medical, dental and psychiatric services, including sick call shall be provided by the Health Services staff of the Billerica House of Correction.

a.  Sick call shall be held Monday through Friday mornings. The nurse assigned to the SMU sick call detail will triage inmates in their living areas.

b.  Those inmates on sick call who require further health care will be escorted to the infirmary by an officer.

c.  Inmates assigned to the SMU wishing to be seen at sick call will place a note indicating such in the sub-unit sick call box before 7:30 a.m. All sick call boxes shall be emptied and the slips collected by a nurse during the morning distribution of medication. The sick call roster shall be made up from the collected slips.

d.  On each Monday, Wednesday and Friday, a nurse will make a round and speak with *each* SMU inmate. The name of the nurse, the date and time of the round shall be recorded in the infirmary logbook. Any health related complaints and treatment plans for such complaints shall be noted on the medical record.

2.  Emergency medical, dental and psychiatric services shall be delivered by the appropriate health services clinician. The officer assigned to the SMU sub-unit will immediately notify the infirmary, via the telephone, of any emergency health related complaint. The officer making this verbal report shall document this by submitting a *Communication* or *Incident Report*. The responding health services staff member will determine what, if any, interventions need to be made, and shall document this on the inmate's medical card.

3.  All prescribed medication shall be distributed by health services staff to SMU inmates as ordered by the physician and in accordance with Policy and Procedure 615 - Management of Pharmaceuticals and any applicable state or federal laws. The health services staff member dispensing the medication will make the appropriate notation in the medication administration record (MAR) according to health services protocols.

4.  Health services staff may evaluate and recommend the removal or withholding of an SMU inmate's personal items. Health services staff will make such a recommendation based solely on clinical evidence that such an item presents a danger to the inmate or to others.

a.    The health services staff member making this determination will notify the Special Unit Manager or the Shift Commander of the need to remove personal items from an SMU inmate. The health service staff member will make this notification first verbally by telephone and shall subsequently submit a *Communication Report* to the Shift Commander. A copy of this report will be placed in the inmate's medical record. The health services staff member will also document the incident on the inmate's medical card.

b.    Included in the notation made on the inmate's medical card will be a treatment plan pertaining to the reason for the removal of personal items. This treatment plan will include, but not be limited to, a referral to the appropriate clinician and specific conditions for returning the items when the health-related problem has abated.

c.    The health services staff member shall inform the Shift Commander when the health related problems have abated and shall recommend that the personal items be returned to the inmate. Notation of this will be made on the inmate's medical card.

5.    Health service staff shall provide an initial medical screening and physical examination for all orientation unit inmates.

a.    The initial medical intake shall be completed by a nurse prior to the inmate being assigned and placed in the orientation unit. This medical intake shall be done according to established health services policy and protocols and will include, but not be limited to, a physical assessment, mental health/suicidality assessment, TB screening and blood work. Any medical or mental health problems, which relate to the inmate's housing needs will be reported to the assignment officer and noted on the inmate's medical card.

b.    All inmates committed for 30 days or longer will have a complete physical examination by the physician, or by other qualified examiner, within 7 days of their admission to the orientation unit.

6.    Certain SMU inmates must be evaluated by a qualified mental health worker.

a.   All inmates housed in the Administrative Segregation, Protective Custody and Jail Units for 30 days or longer will be evaluated by a qualified mental health worker and will be re-evaluated every 90 days thereafter should they remain housed within the SMU.

b.   A report documenting the findings of these assessments will be forwarded to the Superintendent and Assistant Superintendent. A copy of the report will be filed in the respective inmate's medical record.

c.   A schedule, which ensures that each inmate in the SMU is assessed as required above.

## .10    Cell Contents

1.   Contents of Protective Custody, Jail, and Orientation Unit Cells

a.   Upon admission to protective custody, the jail unit or the orientation unit, inmates shall be provided with the following issued items:

   i.     2 towels
   ii.    1 blanket
   iii.   1 pillow
   iv.    1 pillow case
   v.     2 sheets
   vi.    2 uniform jumpsuits (gray for jail inmates; blue for all others)
   vii.   2 T-shirts
   viii.  2 sets of underwear
   ix.    2 pair of socks
   x.     1 pair of sneakers
   xi.    1 pair of shower shoes
   xii.   1 pencil and writing paper (upon request) and
   xiii.  envelopes (upon request).

b.   Each inmate will be authorized to retain in his cell the following personal items:

   i.     Up to 6 undershorts
   ii.    Up to 6 tee shirts
   iii.   Up to 6 pair of socks
   iv.    Up to 3 books or magazines

     *v.*    a reasonable quantity of mail

     *vi.*   Up to 1 cubic foot of legal material

     *vii.*  personal hygiene items such as soap, toothpaste, toothbrush, and comb and

     *viii.* purchased canteen articles (PC and Jail units only).

2.    <u>Contents of Administrative Segregation, Disciplinary Detention and Lower Segregation Unit Cells</u>

    a.    Upon admission to administrative segregation, disciplinary detention or the lower segregation unit, inmates shall be provided with the following issued items:

        *i.*     2 towels

        *ii.*    1 blanket

        *iii.*   1 pillow

        *iv.*   1 pillow case

        *v.*     2 sheets

        *vi.*    1 uniform jumpsuits

        *vii.*   1 pair of shower shoes and

        *viii.*  1 pencil, envelopes and writing paper as issued.

    b.    Each inmate will be authorized to retain in his cell the following personal items:

        *i.*     2 undershorts

        *ii.*    2 tee shirts

        *iii.*   2 pair of socks

        *iv.*   3 books

        *v.*     a reasonable quantity of mail and

        *vi.*    1 cubic foot of legal material.

    c.    The Unit Manager or Shift Commander may order that any item be withheld from an inmate assigned to AdSeg or DDU unit if, in his opinion, such action is necessary to ensure the safe, secure, and orderly running of the unit. However, the withholding of any such item shall not be taken as a disciplinary action and shall not be imposed longer than necessary to ensure the safe, secure, and orderly running of the unit.

    d.    In the event that an item is withheld, the Unit Manager or Shift Commander will submit a report to the Assistant Superintendent for Operations, which includes the following:

i.   the inmate's name and institution number
ii.  the item that was withheld
iii. the reason for the action and
iv.  the length of time the item was or is to be withheld.

e.   If circumstances warrant the removal of all of an inmate's personal effects, approval for this action shall be obtained in advance from the Unit Manager or Shift Commander unless there is imminent danger that an inmate will induce self-injury.

## .11    Daily Operational Procedures

1.   Inmate Counts - Consistent Policy and Procedure 504H - Inmate Movement and Count Procedure, body counts shall be **taken each half-hour** in all Special Management sub-units. Counts shall be taken in the Protective Custody and the Jail Unit each half hour even during those times when the population may be away from the unit, (such as in the gym, yard, training center or dining hall). The officer in charge of the 3rd tier SMU, or for PC the officer in charge of the 2nd tier, shall be responsible to ensure that such counts are taken.

2.   Cell Checks - Every cell in the SMU shall be searched for contraband on both the 8-4 and 4-12 shift daily. The completion of searches shall be documented in the sub-unit log book. In the event that contraband is found, the officer shall prepare and submit a *Communication Report* or, if appropriate, a *Disciplinary Report*. The report must describe the contraband, which was found. At the same time, each cell in the SMU shall be inspected so as to detect any tampering with security or safety devices including bars, windows, walls, ceilings, vents and plumbing. Compliance with room decorum standard shall be enforced.

3.   Discipline - All the provisions of Policy and Procedure 430 - Inmate Rules and Discipline shall apply to SMU inmates.

4.   Personal Hygiene Items – When needed, a hygiene kit containing soap, toothpaste, toothbrush, and comb will be provided to each AdSeg or DDU inmate. The officer issuing such items will ensure that any item issued to an inmate is returned and properly stored. Disposable razors shall be issued to each AdSeg or DDU inmate requesting a razor during shower periods only. The razor shall be retrieved by the officer prior to the inmate returning to his cell.

5.  Common Area Searches - At least once on each shift, officers shall conduct a thorough search of all common areas within the SMU. These areas include:

    a.  the shower room
    b.  individual shower cells
    c.  the personal laundry area
    d.  stairway to the gym
    e.  fire stairways (K-side and I-side) and
    f.  the common area adjacent to the control station.

    These areas shall also be searched immediately prior to their use by SMU inmates. The gym, the training center, the jail yard and the tunnel shall also be searched prior to use.

## .12   Reporting Requirements

1.  Unit Log Books - In accordance with Policy and Procedure 501 - Communication, Reporting and Supervision, officers shall be responsible for maintaining unit log books for each staffed sub-unit and for recording the following information:

    a.  Upon admission, the inmate's name, institution number, time of admission, cell assignment and any medical conditions known by the officer.

    b.  Counts, court appearances, medical trips and returns from these absences.

    c.  The names of all staff working in the unit including reliefs and any personnel or visitors who enter the unit.

    d.  All incidents and any unusual behavior or occurrences.

    e.  Routine shift activities such as meal service, dispensing of medication, sick call, recreation, showers, searches and cell changes.

    f.  Upon release, the inmate's name, institution number, destination, the date and the time of release.

    g.  Verification of restraint equipment, other assigned equipment, keys and counts shall be recorded.

2.  <u>Disciplinary, Incident, Communication and Maintenance Reports</u> - Staff assigned to the SMU shall submit *Disciplinary, Incident, Communication* and *Maintenance Reports* as required by established procedures. To ensure the proper classification of inmates and the safe and orderly running of the unit, it is essential that such reports be completed on any and all inmate activity, regardless of apparent significance.

3.  <u>Weekly Inmate Report</u> (applies to the Segregation Unit only) - This report shall be initiated upon an inmate's admission to the segregation unit and weekly thereafter. Completed forms shall be filed in the inmate's segregation folder. On each shift, relevant information for each inmate in the unit shall be recorded (such as showers, recreation, food service, laundry service and barbering service). Additionally, at the end of each shift, or more often if necessary, the officer shall record a brief comment regarding the inmate's compliance with facility and unit rules.

4.  <u>Inmate Segregation Folder</u>

    a.  A segregation folder shall be established for each inmate housed in a segregation unit.

    b.  The following information and documentation shall be maintained in the folder:

        i.    Notice of Temporary Assignment to Administrative Segregation
        ii.   Copy of the *Booking Memo*
        iii.  Copies of disciplinary, incident and communication reports generated within the unit
        iv.   Weekly Inmate Report
        v.    Classification reviews and
        vi.   Other pertinent documents.

    c.  Upon an inmate's release from a segregation unit, his segregation folder shall be maintained on file by the Segregation Unit Manager until the end of sentence at which time the folder may be destroyed. (Should we destroy?)

### .13  Administrative Segregation Unit (AdSeg)

1.  Placement

a.   Immediate Segregation - The Shift Commander may order the immediate segregation of an inmate when it is deemed necessary to protect the inmate or others, or to maintain the security and orderly running of the facility.   Whenever this occurs, the Shift Commander shall ensure that a Notice of *Temporary Assignment to Administrative Segregation* form is completed and served on the inmate; the Shift Commander shall designate the initial status level of the inmate.   If the Shift Commander fails to designate a status level, the inmate shall be considered as status level II until otherwise classified.  Copies of pertinent reports shall be attached to a copy of this notice and forwarded to the Director of Classification, the Superintendent and Assistant Superintendent.

b.   Administrative Segregation - An inmate shall be designated as Administrative  Segregation  status  only  upon  the  written recommendation  of  the  Classification  Committee.    Such recommendation shall be based on documentation that the inmate's presence in general population poses a serious threat to life, property, the inmate, other inmates, staff, or to the security or orderly running of the facility.   Such documentation may include, but is not be limited to, the following:

   *i.*    the inmate's social and criminal history
   *ii.*   the inmate's disciplinary history at this or another facility
   *iii.*  information provided by mental health staff
   *iv.*   incident and communication reports regarding the inmate
   *v.*    intelligence information gathered by the Security Threat Group Unit
   *vi.*   the inmate's institutional adjustment and
   *vii.*  any other relevant information.

c.   The Superintendent or Assistant Superintendent, will review all such classification recommendations and either approve, deny, or modify the recommendations.

2.   Review and Release

a.   Within 72 hours of an inmate being placed in segregation by way of a *Notice of Temporary Assignment to Administrative Segregation,* the Shift Commander shall ensure that the Director of Classification or Assistant Superintendent has

reviewed the status of the inmate to determine if continuation of segregation is warranted.

b.    Within 3 days of an inmate being placed in Administrative Segregation, excluding weekends and holidays, a hearing shall be held by a Classification Committee to determine if the inmate is to be formally classified to Administrative Segregation or returned to the general population. This classification shall be reviewed by the Superintendent or Assistant Superintendent, who shall approve, deny, or modify the classification.

c.    The status and progress of every inmate classified as Administrative Segregation shall be reviewed at least weekly thereafter by the Classification Committee. The results shall be reviewed by the Superintendent, or the Assistant Superintendent, who shall approve, deny, or modify the classification.

d.    Status Levels - The Classification Committee shall designate a status level for each inmate classified as Administrative Segregation. This designation shall reflect a judgment of the risk presented by the inmate and shall also reflect the inmate's progress in adhering to the regulations of the unit. The status level of each inmate shall be reviewed at least weekly; however, the Committee may review an inmate's status at any time upon its own motion or upon referral of unit staff. The progressively higher status designations shall afford greater privileges leading ultimately to return to general population.

i.    Level I Status - Inmates designated Level I Status shall be provided all programs and services specified in 423H.13.3.    After review, based on the inmate's compliance with facility and unit rules, the Classification Committee may authorize the inmate's status to change to Level II.

ii.    Level II Status - Inmates designated Level II Status shall be provided all programs and services as in Level I and shall be authorized telephone privileges 5 times per week and one scheduled non-contact visit per week. After review, based on the inmate's compliance with facility and unit rules, the Classification Committee may authorize the inmate's status to change to Level III.

    *iii.*    <u>Level III Status</u> - Inmates designated Level III Status shall be provided with all programs and services as in Level II and shall be authorized two scheduled non-contact visits per week, unlimited telephone privileges during recreation periods and shall be assigned a job in the unit. Additionally, based on availability of program staff, the inmate may be required to attend a treatment or other programs. Based on the inmate's compliance with facility and unit rules, and his successful completion of work and program assignments, the inmate may be classified to return to a general population.

e.    The Classification Committee shall take into account the following factors when determining the progression to a different status level and release to general population:

    *i.* progression to level III
    *ii.* demonstrated behavior within the Seg Unit
    *iii.* compliance with the rules of the unit and of the facility or
    *iv.* on-going issues such as security threat group activity or escape risk.

The Classification Committee may recommend release at any hearing regardless of the current level.

f.    All classification decisions referred to in the section shall be reviewed and approved by the Superintendent or Assistant Superintendent, prior any change in status level or reassignment to general population.

g.    In the event that an inmate commits any rule violation, his status in the unit *may* be re-established at a lower level by the Classification Committee or Director of Classification.

h.    The inmate shall be present at the initial hearing and may, at the request of the Classification Committee, be present at the review hearing. If the inmate is not present at a review, he shall be allowed to submit a written statement on his behalf. An inmate's refusal to attend a classification review shall be documented but shall not be considered when the Committee is making decisions or recommendations.

3.    Programs and Services

a.    Each inmate classified to the segregation unit, whether initially or after review, shall be afforded, at a minimum, the following:

i.    Recreation out of cell at least 1 hour per day, 5 days per week.

ii.    Opportunity to shave and shower at least 3 times per week.

iii.    Barbering and hair care upon request at least once per month.

iv.    Issue and weekly exchange of clothing, bedding, linens and towels.

v.    Access to basic personal items for use in their cell unless there is imminent danger that an inmate or other inmates will use the item in an attempt to breach security, destroy an item, induce self-injury or inflict injury to another.

vi.    Medication as prescribed in accordance with health services policy and procedures.

vii.    The same meal as served to the general population. Inmates who are prescribed a special diet shall be served a meal consistent with the requirements of such diet.

viii.    same rights to send and receive mail as general population proscribed by Policy and Procedure 481 - Inmate Mail.

ix.    Telephone privileges when related specifically to access to judicial process and family emergencies as determined by Unit Manager or the Shift Commander.

x.    Official visits when related specifically to access to judicial process.

xi.    Reasonable access to legal material and reading material.

xii.    Access to the chaplaincy staff.

    *xiii.* Access to commissary and canteen services

 b. In addition to the above, consistent with the security interests of the facility and the inmate's status level, an Administrative Segregation inmate may also be authorized access to the following:

    *i.* Non-contact visiting privileges on a scheduled basis
    *ii.* Telephone privileges
    *iii.* Paperback books supplied by the library
    *iv.* Participation in work assignments and
    *v.* Educational programs.

 c. Caseworker services are available to AdSeg inmates upon request. Such requests shall be made by the inmate to the unit officer. The officer shall notify the Director of Human Services by telephone. Voice mail may be left. All notifications shall be logged. When emergency intervention is appropriate and a caseworker is not available, the Shift Commander shall be notified and shall arrange appropriate services.

 d. Administrative Segregation inmates may request educational services through caseworkers, educational staff, unit correctional staff or through the Special Unit Manager. The Director of Education shall evaluate the request, review the inmate's educational assessment and determine the appropriate educational program.

 e. The Shift Commander may order that any item, program, service or activity be withheld from an inmate assigned to a segregation unit if, in the Shift Commander's opinion, such action is necessary to ensure the safe, secure, and orderly running of the unit. However, the withholding of any such item, program, service, or activity shall not be taken as a disciplinary action and shall not be imposed longer than necessary to ensure the safe, secure, and orderly running of the unit.

 f. In the event that an item, program, service, or activity is withheld, the Shift Commander shall ensure that a report is prepared and submitted to the Assistant Superintendent and to the Director of Classification which includes the following:

    *i.* the inmate's name and institution number

     *ii.*    the item, program, service, or activity that was withheld

     *iii.*   the reason for the action and

     *iv.*   the length of time the item, program, service, or activity was or is to be withheld.

4.    Operations

    a.    Level I inmates shall be restrained in handcuffs (with hands in front) and leg irons any time they are out of their cells with the exception of shower periods when the inmate shall be taken out of the restraints while in the shower room. Level II and Level III inmates shall be similarly restrained during showers and shall be restrained with hands in front during recreation periods to allow use of the telephones. Any inmate who does not comply with an officer's instructions relative to being restrained shall not be allowed out of his cell and the officer shall prepare and submit an *Incident Report.*

    b.    Officers shall ensure that inmates who are in direct contact with one another shall be restrained in the same method. For example, an inmate in full restraints shall not be out for recreation with an inmate restrained only in handcuffs.

    c.    Inmates in the segregation unit shall be provided recreation on the tier. Inmates in the lower segregation unit shall be provided recreation in that unit. The Unit Manager or Shift Commander shall periodically authorize recreation be conducted in a secure outdoor recreation area when conditions permit. Such recreation shall be documented in the unit logbook, on the unit shift report, and on the appropriate *Weekly Inmate Segregation Report.*

    d.    Unit officers shall deliver all inmate meals in the segregation units. Meals shall be passed to the inmate through the cell door slot. Prior to the meal being provided to the inmate, the food shall be observed for any evidence of contraband. Upon the completing of the meal period, each inmate is to properly dispose of all the food service items including tray, containers, and utensils as directed by the unit officer.

    e.    The Unit Manager or Shift Commander or designated supervisor shall determine the number of inmates authorized out of cell at any one time.

f.     Every inmate in the segregation unit shall be observed by an officer at least every 30 minutes. Additionally, inmates out of cell for any reason shall be under constant observation.

g.     Prior to an inmate in segregation moving from one secure area to another, the inmate shall be pat searched. Inmates shall be pat searched each time they leave the unit and each time they return to the unit.

## .14    Disciplinary Detention Unit (DDU)

1.    Placement

An inmate shall be placed on disciplinary detention status only upon the written finding and sanction of a disciplinary board as specified by Policy and Procedure 430 - Inmate Discipline.

2.    Review

Whenever an inmate serving disciplinary detention remains DDU beyond 30 days, the Unit Manager shall notify the mental health staff and a psychological assessment shall be conducted. If such status continues, a psychological assessment shall be conducted every month thereafter. The results of such assessments shall be reported to the Director of Health Services, the Superintendent and Assistant Superintendent.

3.    Release

Inmates completing a disciplinary detention sanction in the DDU shall presumptively be reassigned from the unit to general population by the Director of Classification or designee. The Director may, if the conditions specified by 423H.13.1 are met, classify the inmate to the segregation unit.

4.    Programs and Services

a.     Each inmate classified to the DDU shall be afforded, at a minimum, the following:

i.     Recreation out of cell at least one hour per day, five days per week.

ii.     Opportunity to shave and shower at least three times per week.

*iii.*    Barbering and hair care upon request at least once per month.

*iv.*    Issue and/or weekly exchange of clothing, bedding, linens and towels.

*v.*    Access to basic personal items for use in their cell unless there is imminent danger that an inmate or other inmates will use the item in an attempt to breach security, destroy an item, induce self-injury, or inflict injury to another.

*vi.*    Medication as prescribed in accordance with Policy and Procedure 615 - Management of Pharmaceuticals.

*vii.*    The same meal as served to the general population. Inmates who are prescribed a special diet shall be served a meal consistent with the requirements of such diet.

*viii.*    The same rights to send and receive mail as general population proscribed by Policy and Procedure 481 - Inmate Mail.

*ix.*    Telephone privileges when related specifically to access to judicial process and family emergencies as determined by the Unit Manager or the Shift Commander.

*x.*    Official visits when related specifically to access to judicial process.

*xi.*    Reasonable access to legal material and reading material.

*xii.*    Access to the chaplaincy staff.

b.    The Unit Manger or Shift Commander may order that any item, program, service or activity be withheld from an inmate assigned to the DDU if, in his opinion, such action is necessary to ensure the safe, secure, and orderly running of the unit. However, the withholding of any such item, program, service, or activity shall not be taken as a disciplinary action and shall not be imposed longer than necessary to ensure the safe, secure, and orderly running of the unit.

c.    In the event that an item, program, service, or activity is withheld, the Unit Manager or Shift Commander shall ensure

that a report is prepared and submitted to the Assistant
Superintendent, which includes the following:

*i.*     the inmate's name and institution number
*ii.*    the item, program, service, or activity that was withheld
*iii.*   the reason for the action and
*iv.*    the length of time the item, program, service, or activity
         was or is to be withheld.

5.   Operations

   a.   Inmates shall be restrained in handcuffs (with hands in front)
        and leg irons any time the inmate is out of his cell with the
        exception of shower periods when the inmate shall be taken out
        of the restraints while in the shower room. Any inmate who
        does not comply with an officer's instructions relative to being
        restrained shall not be allowed out of his cell and the officer
        shall prepare and submit an *Incident Report*.

   b.   Officers shall ensure that inmates who are in direct contact with
        one another shall be restrained in the same method. For
        example, an inmate in full restraints shall not be out for
        recreation with an inmate restrained only in handcuffs.

   c.   Inmates in the DDU shall be provided recreation on the tier.

   d.   Unit officers shall deliver all inmate meals in the DDU. Meals
        shall be passed to the inmate through the cell door slot. Prior to
        the meal being provided to the inmate, the food shall be
        observed for any evidence of contraband. Upon the completing
        of the meal period, each inmate is to properly dispose of all the
        food service items including tray, containers, and utensils as
        directed by the unit officer.

   e.   The Shift Commander or designated supervisor shall determine
        the number of inmates authorized out of cell at any one time.

   f.   Every inmate in the DDU shall be observed by an officer at least
        every 30 minutes. Inmates placed on a suicide watch shall be
        observed at least every 15 minutes. Additionally, inmates out of
        cell for any reason shall be under constant observation.

   g.   Prior to an inmate in DDU moving from one secure area to
        another, the inmate shall be pat searched. Inmates shall be pat

searched each time they leave the unit and each time they return to the unit.

## .15    Protective Custody Unit (PC)

1.    Immediate Placement

The Shift Commander may order the immediate assignment of any House of Correction inmate to the Protective Custody Unit when it is deemed necessary to protect that inmate.  Other options such as reassignment to another cell, tier, or pod should be considered first.  Copies of pertinent reports shall be forwarded to the Director of Classification, the Superintendent and Assistant Superintendent.

2.    Review and Release

    a.    Within 3 business days of an inmate being initially placed in Protective Custody, a hearing shall be held by a Classification Committee to determine if the inmate should be formally classified to the Protective Custody based on documentation that his presence in general population poses a serious threat to his life, safety or well being.  Such documentation may include, but is not be limited to, the following:

        *i.*     the inmate's social and criminal history
        *ii.*    information provided by mental health staff
        *iii.*   *Incident* and *Communication Reports* regarding the inmate
        *iv.*    intelligence information gathered by the Security Threat Group Unit and
        *v.*     any other relevant information.

    b.    This classification shall be reviewed by the Superintendent or Assistant Superintendent who shall approve, deny, or modify the classification to Protective Custody.

    c.    The status of every inmate classified as Protective Custody shall be reviewed weekly for the first 30 days of confinement in the Protective Custody Unit and monthly thereafter by the Classification Committee.  Upon each review the Classification Board shall seek to implement an alternative to continued housing with in the Protective Custody unit.  Additionally, any PC inmate may complete and submit a form requesting transfer

to general population.  The results shall be reviewed by the Superintendent or Assistant Superintendent.

d.    The inmate shall be present at the initial hearing and may, at the request of the Classification Committee, be present at review hearings.  If the inmate is not present at a review, he shall be allowed to submit a written statement on his behalf.  An inmate's refusal to attend a classification review shall be documented by the Classification Committee.

3.    Programs and Services

The Special Unit Manager shall establish and maintain a schedule of activities to provide the following services.  This schedule must conform with the scheduled activities of the other sub-units of the SMU.

a.    Canteen - PC inmates shall have full access to canteen services.  These inmates shall be brought to the canteen on Thursday at 11:30 a.m.  Indigent PC inmates shall be issued personal hygiene kits, which contain a toothbrush, comb, shampoo, deodorant, toothpaste, soap, razors, shaving cream Tylenol® and antacid.

b.    Inmate Accounts - Cash or money orders for PC inmates may be left at the Front Office Control Center at the beginning of any visiting period and on Monday through Friday, holidays excluded, from 10 a.m. through 3 p.m.

c.    Mail - All PC inmates shall be allowed to send and to receive mail in the same manner as general population inmates as proscribed by Policy and Procedure 481 - Inmate Mail.  Locked depositories for outgoing mail accessible to all sub-unit inmates shall be provided.  Outgoing mail shall be collected daily, except on Sundays and postal holidays and shall be delivered to the mailroom.  Mail shall be distributed Monday through Saturday afternoon.  Money received through the mail shall be credited to the inmate's account.

d.    Visits - The visiting procedures for inmates housed within the Main Building as proscribed by Policy and Procedure 483H - Visiting Procedures shall apply to PC inmates.  Inmates shall be pat searched prior to a visit and following the visit.  The following visiting schedule shall apply:

|  |  |  |
|---|---|---|
| Evening: | Sunday, Monday, Tuesday, Wednesday, Friday | 5:00 p.m. to 6:15 p.m. |
| Afternoon: | Saturday | 8:45 a/m. to 10:45 a.m. |

e.  Attorney Visits - PC inmates shall receive attorney visits as proscribed in <u>Policy and Procedure 486 - Attorney Access and Inmate Rights</u>.

f.  Telephone Privileges - PC inmates may utilize the inmate telephones located within PC during recreation periods and at other times if authorized by the Unit Commander or Shift Commander. Calls to attorneys and other calls related to legal matters shall be processed by the inmate's caseworker as provided for by <u>Policy and Procedure 482- Telephone Access And Use</u>.

g.  Recreation - The Special Unit Manager shall implement a tier recreation schedule for the PC. Recreation on the tier shall be available to PC inmates. The sub-unit recreation schedule shall be displayed within the PC unit.

The PC unit shall be allowed access to the gym each day as follows:

Seven days/week          4 p.m. - 5 p.m.

The PC unit shall be allowed access to the Jail Yard as follows:

| | |
|---|---|
| Sunday | 11:30 a.m. - 12:15 p.m. |
| Monday | 11:30 a.m. - 12:15 p.m. |
| Wednesday | 11:30 a.m. - 12:15 p.m. |
| Saturday | 11:30 a.m. - 12:15 p.m. |

h.  Showers - PC inmates shall be allowed to shower during their recreation periods and again between 5:30 p.m. and 6:30 p.m. each evening.

i.  Meals - All meals shall be delivered to inmates. Inmates shall consume their meals in their cells. Medical and religious diet menus will be honored. An officer shall pass each meal through the open cell door to the inmate after checking the meal for contraband. Upon the completion of the meal period, each

inmate shall dispose of all the food service items including tray, containers and utensils as directed by the unit officer.

j.  Medical Services - Emergency medical and psychiatric services are available to PC inmates. Daily sick call shall be available to PC inmates. Prescribed medications shall be delivered to these inmates at their cells by infirmary staff as prescribed by the physician.

k.  Caseworker Services - Social services shall be provided to PC inmates by their assigned caseworker. PC inmates shall be escorted to the Training Center on Tuesdays and Thursdays from 11:30 a.m. to 12:15 p.m. for the purpose of accessing social services and Canteen.

l.  Legal Services - A staff attorney shall be available to PC inmates once a week either on Tuesday or Thursday (Check schedule) during those hours when PC inmates are allowed in the Training Center.

m.  Library Service - The library is fully accessible to PC inmates during those period when they are allowed access to the Training Center. PC inmates shall have borrowing privileges.

n.  Religious Services - Protestant Bible Study is conduct for PC inmates on Wednesdays from 9:45 a.m. to 11:30 a.m. Catholic chaplains are available to these inmates on Sundays between 11 a.m. and 12:15 p.m. (check schedule)

o.  Treatment Meetings - The following treatment meetings take place on a scheduled basis for PC inmates:

| | | |
|---|---|---|
| Alcoholics Anonymous | Tuesday | 6:30 p.m. - 7:30 p.m. |
| Narcotics Anonymous | Friday | 6:30 p.m. - 7:30 p.m. |
| HIV/AIDS Awareness | Wednesday | 4 p.m. - 5 p.m. |
| | | Check schedule) |

p.  General Education Development - GED class is conducted for PC inmates in the Training Center on Thursdays from 11:30 a.m. to 12:15 p.m.

q.  Laundry Exchange - PC inmates may exchange issued clothing, blankets, linens and towels on Mondays at 7 a.m. PC inmates may have their personal items such as underwear laundered by

the assigned worker. The assigned worker shall wash, dry and fold such items on Monday, Tuesday, Wednesday, Thursday and Saturday from 12:15 a.m. to 3:30 a.m. in the second tier washer/dryer room under the supervision of the unit officer.

r.    Haircuts - Barber services are available to PC inmate on the third tier on Friday morning during recreation. The PC unit barber tools shall be locked in the officer's desk when not in use. These tools consist of 2 clippers, accessories, 1 pair of scissors and sanitizing agent.

s.    Inmate Work - PC inmates are eligible to work in the canteen.

## 4.    Operations

a.    The officer assigned to the PC sub-unit on each shift shall complete a *PC Unit Shift Roster/Count Sheet.* This roster shall be turned into the Unit Manager.

b.    Gate Control - When not in use, the G-side fire door shall be kept locked. The G & H tier gate shall be kept locked when not in use during the 8-4 shift and during the 4-12 shift until time of lockdown. From the time of lockdown through the 12-8 shift, the G & H tier gate may remain open to facilitate the monitoring of the PC unit.

c.    Movement - All movement from the PC sub-unit shall be under condition of escort. The route selected shall minimize the possibility of contact with all other inmates.

d.    Every inmate within the PC sub-unit shall be observed by an officer at least every 30 minutes.

## .16    Orientation Unit

1.    Placement

Upon commitment to the House of Correction, and after completion of the booking and medical screening process, each inmate cleared for general population housing will be initially housed in the orientation unit.

2.    Release

    a.    After completion of the orientation program including intake, medical examination, the initial classification hearing and approval of the inmate's initial security housing level, the inmate shall be reassigned from the orientation unit to his initial housing unit.

    b.    The length of stay in the orientation unit is normally 3 business days. However, depending upon space availability in the various security housing levels an inmate may remain in the unit longer. Normally, within 2 business days of admission, a caseworker will interview the inmate and complete a classification intake. Following intake, the caseworker will schedule the inmate for his initial classification hearing.

    c.    If any inmate's length of stay exceeds 5 business days the Special Unit Manager shall notify the Director of Classification, Assistant Superintendent and the Superintendent. Such an inmate shall, commencing on the sixth business day, be afforded all the privileges of general population.

3.    Programs and Services

    a.    Inmates in the orientation unit will be required to participate in the various phases of the orientation program, which consists of the following:

        *i.*    HIV and Communicable Disease Orientation

        *ii.*    Orientation Meetings which cover the following subjects:

- Inmate Rules and Discipline
- Description and Availability of Programs and Services
- Canteen and Inmate Funds
- Classification and Work Assignments
- Visiting Program
- Recreation
- Inmate Property
- Inmate Telephone Procedures
- Access to religious services
- Parole and
- Medical Services.

    *iii.*    Medical Examination

    *iv.*    Educational Assessment

    *v.*    Substance Abuse Assessment

    *vi.*    Inmate Identification and

    *vii.*    Establishment of the Individual Service Plan.

b.    While assigned to the orientation unit, inmates will be provided limited access to programs and services. Out of cell time may be limited but shall satisfy minimum standards and shall be sufficient to complete the orientation and intake process. The Special Unit Manager shall establish and maintain a unit schedule of activities to provide the following services. This schedule shall be posted within the sub-unit and shall conform to the scheduled activities of the other sub-units of the SMU:

    *i.*    Canteen - Canteen services are not available in the orientation unit. All unit inmates are issued a starter kit, which contains a toothbrush, comb, shampoo, deodorant, toothpaste, soap, razors, shaving cream, Tylenol® and antacid adequate for 5 days.

        Inmate Accounts - Funds in the possession of an inmate at the time of commitment shall be credited to that inmate's canteen account. Cash or a money order for an orientation unit inmate may be brought to the Front Office Control Center on Monday through Friday, holidays excluded, from 10 a.m. through 3 p.m.

    *ii.*    Mail - All inmates assigned to the orientation sub-unit shall be allowed to send and to receive mail in the same manner as general population inmates as proscribed by Policy and Procedure 481 - <u>Inmate Mail</u>. Locked depositories for outgoing mail accessible to all sub-unit inmates shall be provided. Outgoing mail shall be collected daily, except on Sundays and postal holidays and shall be delivered to the mailroom. Mail shall be distributed Monday through Saturday afternoon. Money received through the mail shall be credited to the inmate's account.

iii.    Visits - Except for visits by persons named in section .07.9 of Policy and Procedure 483H - <u>Visiting Procedures</u>, sub-unit inmates shall not receive visits unless specifically authorized by the Superintendent or Assistant Superintendent.

iv.    Attorney Visits - Sub-unit inmates shall receive attorney visits as proscribed in Policy and Procedure 486 - <u>Attorney Access and Inmate Rights</u>.

v.    Telephone Privileges - Inmates assigned to the orientation sub-unit shall be allowed a phone call upon commitment. Sub-unit inmates may utilize the inmate telephones during recreation periods.

vi.    Recreation - The Special Unit Manager shall establish a recreation schedule, which allows each inmate, unless restricted for medical or disciplinary reasons, at least two hours of recreation out of his cell daily.

vii.    Showers - Inmates shall be allowed to shower and shave upon commitment. Sub-unit inmates are allowed to shower during their recreation periods.

viii.    Meals - All meals shall be delivered to inmates in the sub-unit. Inmates shall consume their meals in their cells. Special diet menus will be honored.

ix.    Medical Services - Emergency medical and psychiatric services are available to inmates within the orientation sub-unit. Daily sick call shall be available to sub-unit inmates. Prescribed medications shall be delivered to sub-unit inmates at their cells by infirmary staff.

x.    Legal Services - Legal services shall be provided to inmates within the orientation sub-unit on an emergency basis through referral by the caseworker.

xi.    Library – Library staff provide inmates access to library materials including legal materials. Books or other items will be delivered to the sub-unit.

4.    Operations

a.   Custody procedures related to newly committed inmates -
Correctional staff shall be aware that newly committed inmates
may present a risk of suicidal behavior or unknown medical
conditions, including detoxification from alcohol, drugs, or
cigarettes.   Such inmates may also have attempted to hide
contraband on their person prior to commitment.  Medical staff
may require that certain inmates deemed to be at risk shall be
monitored closely.

b.   Passage Gate - When not in use the gate between the
orientation unit and the AdSeg sub-unit shall be kept locked on
the 8-4 shift and on the 4-12 shift until time of lockdown.  From
time of lockdown through the 12-8 shift the gate may remain
open to facilitate the monitoring of the sub-units.  A key to this
gate shall be maintained in the SMU control station and also on
the AdSeg sub-unit ring.

## .17   Jail Unit

1.   Jail Unit Mission

a.   The jail unit has been established specifically to house pretrial
detainees at the House of Correction. This sub-unit is located on
the third tier of the Main Building of the Billerica House of
Correction within the Special Management Unit.  The jail unit
shall function as an integral part of the SMU.   The specific
location and number of cells, which comprise the jail unit, shall
be determined by the Superintendent.

b.   The primary mission of the jail unit is the safe and secure
housing of those detainees who are held awaiting trial at the
Billerica House of Correction due to the unavailability of space
at the Cambridge Jail.

c.   Pretrial detainees shall be considered classified to the highest
level of security of the facility.  No such detainee shall be moved
beyond the secure perimeter of the Main Building except under
the conditions of inmate transportation and restraint.

d.   The Cambridge Jail shall be responsible for keeping the official
records of pretrial detainees housed at the Billerica House of
Correction.    This includes the maintaining of original
*mittimuses*, writs of *habeas corpus* and warrants.  Copies of

these documents shall be maintained by the Records Department of the Billerica House of Correction. Court appearances shall be coordinated by the Cambridge Jail.

e.     The transfer of pretrial detainees to facilities outside of Middlesex County shall be the responsibility of the Cambridge Jail.

2.     Placement

Male detainees held in the custody of the Sheriff's Office at the Cambridge Jail may be transferred to the Billerica House of Correction due to overcrowding conditions at that facility. Detainees to be transferred are selected by the Records Supervisor of the Cambridge Jail and approved by the Director of Records at the Billerica House of Correction and Assistant Superintendent based upon the proximity of the facility to the committing court or the detainees' residence. All such detainees transferred to the Billerica House of Correction shall be housed within the jail unit of the SMU.

Pretrial detainees serving cell restriction due to a disciplinary sanction shall serve such sanctions within the jail unit. No pretrial detainee may be housed in any unit other than the jail unit without the specific authorization of the Superintendent or Assistant Superintendent.

3.    Review and Release

Normally jail unit detainees remain within the sub-unit until discharged by the committing court. The Special Unit Manager may recommend the transfer of a detainee to the Cambridge Jail for various reasons including:

a.    request of a detainee
b.    convenience for visitation
c.    enemy situations
d.    security threat group activity or
e.    excessive disciplinary reports.

**4.    Programs and Services**

The Special Unit Manager shall establish and maintain a schedule of activities for the jail unit to provide the following services. This schedule must conform to the scheduled activities of the other sub-units of the SMU.

a.    Canteen - Pretrial detainees shall have full access to canteen services. These detainees shall be brought to the canteen on Wednesday from 11:30 a.m. to 12:15 p.m. Indigent pretrial detainees shall be issued personal hygiene kits, which contain a toothbrush, comb, shampoo, deodorant, toothpaste, soap, razors, shaving cream, Tylenol® and antacid. Detainees who are committed to the sub-unit after Wednesday canteen shall be allowed to access the canteen on Friday from 11:30 a.m. to 12:15 p.m.
(Check schedules)

b.    Detainee Accounts - Individual accounts for each pretrial detainee shall be maintained by the Finance Department of the Billerica House of Correction. Funds in the possession of a detainee at the time of commitment shall be credited to that detainee's canteen account. Cash or money orders for pretrial detainees may be left at the Front Office Control Center at the beginning of any jail visiting period and on Monday through Friday, holidays excluded, from 10 a.m. through 3 p.m.

c.    Mail - All jail unit detainees shall be allowed to send and to receive mail in the same manner as general population inmates as proscribed by Policy and Procedure 481 - Inmate Mail. Locked depositories for outgoing mail accessible to all sub-unit detainees shall be provided. Outgoing mail shall be collected

daily, except on Sundays and postal holidays and shall be delivered to the mailroom. Mail shall be distributed Monday through Saturday afternoon. Money received through the mail shall be credited to the detainee's account.

d.   Visits - The visiting procedures for detainees housed within the Main Building as proscribed by Policy and Procedure 483H - Visiting Procedures shall apply to pretrial detainees. Detainees shall be pat searched prior to a visit and strip searched following the visit. The following schedule shall apply:

| Morning: | Sun and Fri | 9:00 to 10:45 a.m. |
| Evening: | Thurs | 5:00 to 6:00 p.m. |

e.   Attorney Visits - Pretrial detainees shall receive attorney visits as proscribed in Policy and Procedure 486 - Attorney Access.

f.   Telephone Privileges - Pretrial detainees shall be allowed a phone call upon commitment and may utilize the inmate telephones located within the jail unit during recreation periods and at other times if authorized by the Unit Manager or Shift Commander. Calls to attorneys and other calls related to legal matters shall be processed by the detainee's caseworker as provided for by Policy and Procedure 482- Telephone Access And Use.

g.   Recreation - The Special Unit Manager shall implement a recreation schedule for the jail unit. Recreation on the tier shall be available to sub-unit detainees and the recreation schedule shall be displayed within the sub-unit. K side and L side detainees shall have access to the tier on an alternating basis. Recreation on the tier or in the jail yard occurs each day as follows:

| SIDE | TIME PERIOD | LOCATION |
|---|---|---|
| K & L sides | 9:15 a.m. – 10:15 a.m. | Tier |
| K side | 1:30 p.m. – 2:30 p.m. | Tier |
| L side | 2:30 p.m. – 3:30 p.m. | Tier |
| K & L sides | 1:30-p.m. – 2:50 p.m. | Jail Yard |
| K & L sides | 6 p.m. – 7:30 p.m. | Jail Yard |
| K or L (alternating) | 8 p.m. - 9 p.m. | Tier |
| K or L (alternating) | 9 p.m. - 10 p.m. | Tier |
| * 7:30 p.m. is approximate - outside recreation ends at dusk. | | |

During inclement weather recreation in the jail yard shall be replaced by recreation on the tier as follows:

| | |
|---|---|
| L side | 1:30 p.m. - 2:30 p.m. |
| K side | 2:30 p.m. - 3:30 p.m. |
| K or L (alternating) | 6 p.m. - 7 p.m. |
| K or L (alternating) | 7 p.m. - 8 p.m. |

The entire jail unit is allowed access to the gym each day as follows:

| | |
|---|---|
| 8:15 a.m. | 9:15 a.m. |
| 10 p.m. | 10:50 p.m. |

h.  Showers - Detainees shall be allowed to shower and shave upon commitment. Sub-unit detainees are allowed to shower during their recreation periods in the sub-unit shower stall (L-26) and again between 10:45 p.m. and 11 p.m. each evening in the SMU shower room.

i.  Meals - Detainees shall eat their meals in the main building chow hall. Detainees serving disciplinary time in their cells will be delivered the same meal as the general population. Medical and religious diet menus will be honored. An officer shall pass each meal through the open cell door to the detainee after checking the meal for contraband. Upon the completion of the meal period, each detainee shall dispose of all the food service items including tray, containers and utensils as directed by the unit officer.

j.  Medical Services - Routine and emergency medical, dental and psychiatric services are available to pretrial detainees. Sick call shall be available to pretrial detainees. Prescribed medications shall be delivered to these detainees at their cells by infirmary staff as prescribed by the physician.

k.  Caseworker Services - The Director of Human Services shall designate at least one caseworker to provide social services to pretrial detainees. These services shall include but not be limited to:

i.  crisis intervention
ii.  attorney access issues

*iii.*    family issues and

*iv.*    bail and bail reduction issues.

Check Schedule

Jail unit detainees shall be escorted to the Training Center on Mondays, Wednesdays and Fridays from 11:30 a.m. to 12:15 p.m. for the purpose of accessing caseworker services, education programs and the library. Caseworkers assigned to the jail unit shall be available to meet with jail detainees within the sub-unit at least 1 additional day each week.

Check Schedule

l.    Legal Services - A staff attorney shall be available to pretrial detainees once a week either on Monday or Friday during those hours when pretrial detainees are allowed in the Training Center.

m.    Library Service - The library is fully accessible to jail unit detainees during those period when they are allowed access to the Training Center. Jail detainees shall have borrowing privileges.

n.    Religious Services - Protestant Bible Study is conduct for pretrial detainees on Wednesdays beginning at 10 a.m. Catholic chaplains are available upon request to jail detainees on Sundays mornings. Every effort will be made to make clergy of other faiths available to detainees upon request.

Check Schedule

o.    Laundry Exchange - Pretrial detainees may exchange their issued clothing, blankets, linens and towels on Fridays at 7 a.m. Personal items such as underwear may be laundered in the third tier washer/dryer room by an assigned jail detainee as follows:

| K side | Sunday | 12:30 a.m. |
| L side | Friday | 12:30 a.m. |

p.    Haircuts - Barber services are available to pretrial detainee on the third tier on Monday and Wednesday morning.

## 5.    Operations

a.    Because of the high security status of pretrial detainees and because of their non-convicted status, pretrial detainees shall be kept segregated from inmates committed to the House of

Correction. To this end all movement of pretrial detainees, both individually and in group movement, shall be under escort by correctional staff. The timing and route of such movement shall be planned to preclude the chance of physical contact. Gates and passageways, such as the dayroom, wing, tier gates and the gym doors, shall be secured at the time of movement whenever necessary to prevent contact. Verbal communication between pretrial detainees and sentenced inmates shall be prohibited to the extent possible. With the exception of recreation in the gym and in the jail yard, pretrial detainees shall be required to wear the issued gray jumpsuit whenever leaving the third tier.

b.    Gate Control - When not in use, the K-side fire door shall be kept locked. The K & L tier gate shall be kept locked when not in use during the 8-4 shift and during the 4-12 shift until time of lockdown. From the time of lockdown through the 12-8 shift, the K & L tier gate may remain open to facilitate the monitoring of the Jail unit.



## The Commonwealth of Massachusetts
## Middlesex Sheriff's Office

James V. DiPaola
Sheriff

# Policy and Procedure 506

# Searches

### Table of Contents

.01   Date Revised
.02   DOC and ACA Standards Referenced
.03   Policy
.04   Applicability
.05   Civil Deputy Enforcement Unit
.06   Definitions
.07   Strip Searches
.08   Pat Searches
.09   Body Cavity Searches
.10   Area Searches
.11   Perimeter Searches
.12   Vehicle Searches
.13   Visitor Searches
.14   Documentation of Searches
.15   Disposition of Contraband
.16   Crime Scene Procedures
.17   Training

#### .01    Date Revised

The revision date of this policy is April 26, 2002.

#### .02    DOC and ACA Standards Referenced

This policy is consistent with 103 CMR 924.06 and American Correctional Association (ACA) standards 3-4184 through 3-4186 and 3-4269.

### .03    Policy

1.    It is the policy of the Middlesex Sheriff's Office that search procedures be developed and enforced by the Office in order to detect and prevent the introduction of contraband, to recover missing or stolen property, to prevent escapes, and to enhance the safety of staff, inmates and visitors and the security of the facilities.

2.    These procedures shall require the routine and periodic search of inmates as well as of living quarters, visiting areas, and common areas used for recreation, industry, and programs. The Office also requires the planned search of the perimeters of the facilities, the search of vehicles employed in the transport of inmates and arrestees, the search of delivery vehicles which enter the grounds of the Billerica House of Correction. These procedures shall also require the search of visitors to the correctional facilities.

3.    Searches shall be conducted for the following purposes:

   a.    to prevent the introduction, use and possession of weapons and other contraband

   b.    to detect the manufacture of weapons or escape tools

   c.    to suppress trafficking in contraband

   d.    to prevent the waste and destruction of institutional property and

   e.    to detect safety and environmental hazards which may exist.

### .04    Applicability

This policy applies to the Middlesex Sheriff's Office.

### .05    Civil Deputy Enforcement Unit

The Director of the Civil Deputy Enforcement Unit shall establish and promulgate search procedures which are consistent with this policy. These procedures shall require the search of arrestees for the purpose of detecting weapons or possible instruments of escape.

## .06    Definitions

1.    <u>Contraband</u> - any item not approved for retention by an inmate.

2.    <u>Pat Search</u> - the thorough, systematic examination of a person employing the "crush and squeeze" method by dividing the body into quadrants to determine whether that person possesses drugs, a weapon or other contraband.

3.    <u>Search</u> - the thorough, systematic examination of a person, area or object to locate contraband or to discover an escape attempt.

4.    <u>Strip Search</u> - the visual observation of an unclothed person to determine if that person possesses contraband.

## .07    Strip Searches

1.    Inmates shall be strip searched in the following instances:

    a.    upon commitment to the Cambridge Jail or Billerica House of Correction

    b.    return from transportation to the Cambridge Jail or Billerica House of Correction

    c.    return from escape or attempted escape

    d.    after contact visitation in a minimum, medium or maximum security units

    e.    after return to the facility from temporary release and

    f.    prior to placement in a segregation, disciplinary detention or other maximum security unit.

2.    Supervisory officers may, at any time, order the strip search of an inmate. The Office may, through other policy and procedures, directives and post orders, require strip searches in other situations.

3.    Strip searches shall be conducted, to the extent possible, in relative privacy by 2 officers. The searching officer shall be of the same gender as the inmate. These requirements may be waived in an emergency.

4.    The officer conducting the search shall direct the inmate to remove all articles of clothing and to stand clear of the clothing. The officer shall conduct a visual examination of the unclothed inmate observing hair, ears, nose, beneath the tongue, armpits, pubic area, rectum, inner parts of the legs, between the legs, between the toes, and the soles of the feet. Examination shall be made of casts, bandages, false teeth and artificial prostheses. The officer shall issue verbal instructions to facilitate the search. The officer shall examine the inmate's clothing by turning the articles inside out, checking linings, cuffs, waistbands, seams, patches and collars. The soles, heals and interior of footwear shall be checked. All other items such as eyeglasses shall be checked.

5.    When more than one inmate is being strip searched (e.g. at the end of a visiting period or return from outside transportation) the supervising officer shall ensure that those inmates who have been searched do not come in contact with those inmates who have not yet been searched.

### .08    Pat Searches

1.    Pat searches may be employed in the following instances:

a.    Entry to or exit from a housing unit

b.    Upon detection of a disciplinary infraction

c.    Upon suspicion that an inmate possesses contraband

d.    Before visitation and

e.    After visitation at Work Release.

2.    Inmates shall be pat searched whenever transported from a court appearance or medical trip and shall be searched again after each interruption of the trip which requires the inmate to leave the transport vehicle.

3.    A supervisory officer may require a strip search in any of the above instances. Supervisors shall mandate random, frequent pat searches at times of inmate movement. Officers may conduct pat searches of inmates at any time. The Office may, through other policy and procedures, directives, and post orders require pat searches to be conducted in specific situations.

4.   Techniques taught by the Training Department shall be employed when conducting pat searches. The inmate, facing away from the officer, shall be directed to place on a table or on the floor any object in his possession, empty his pockets and to remove any head covering. When searching a group of inmates, the inmates who have been searched should be kept apart from those who have not yet been searched.

## .09   Body Cavity Searches

1.   Manual or instrument inspection of any body cavity of an inmate may be performed only when there is a specific critical reason to do so and only with expressed authorization of the Superintendent. Medical personnel shall perform the body cavity search pursuant to authorization by the Superintendent.

2.   Valid reasons for the authorization of such a search may include a convincing reason to belief that the inmate has hidden or ingested contraband which represents a substantial threat to his or her health or a significant threat to the security of the facility or operations.

3.   When an officer suspects contraband in a body cavity, such as the anal cavity, the officer will request the inmate to remove such material from his person. If the inmate refuses to remove, cannot remove or otherwise fails to comply with the order the Shift Commander shall be notified. In consultation with health services staff, the Shift Commander may order that the inmate be isolated in a secure and safe area, such as the medical isolation cell, under observation until the contraband is surrendered by the inmate or eliminated naturally. Plumbing shall be disabled.

4.   If, within 6 hours, the issue has not resolved or if the inmate's health may be at risk, the Shift Commander shall so notify the Deputy Superintendent or Duty Officer to obtain the authorization of the Superintendent to allow a body cavity search.

5.   Upon the authorization of the Superintendent, the inmate shall be transported to an outside medical facility for further examination, treatment and performance of the search if necessary.

6.   Under no circumstances may an officer extend a search into a body cavity unless the inmate's health is in immediate danger such as from choking. In this case, all related information must be documented on an incident report and submitted to the staff member's supervisor prior to the end of tour of duty. In the event of this type of search, the

inmate shall be subsequently referred to the Health Service Department for a follow-up examination.

## .10    Area Searches

1.    Living Area Searches

Living area searches (searches of housing units, cells, and other inmate quarters) shall be conducted frequently. These searches shall be unannounced and accomplished on an irregularly timed basis. Cells shall be searched before occupancy by a new inmate. A cell should be left in the same condition, as much as possible, as it was prior to the search.    Care shall be taken that authorized inmate property be handled carefully to avoid loss or damage.

2.    Visiting Area Searches

Immediately before and after visiting periods the Supervisor of visits shall ensure that all visiting rooms, shakedown areas, lobbies, entry ways and rest rooms used by visitors are thoroughly searched. In no case shall an inmate be allowed to enter such an area until the search has been completed.

3.    Common Area Searches

Common areas such as shower rooms, recreation areas, work or industry areas and program areas shall be searched frequently for contraband.

## .11    Perimeter Searches

The secure perimeters of the housing units at the Billerica House of Correction shall be searched daily. The inner perimeters of all medium housing units at the Billerica House of Correction shall be searched prior to inmate movement into those areas.

## .12    Vehicle Searches

All vehicles, other than official vehicles or vehicles used by employees to commute to work, shall be searched for contraband upon entering and upon leaving the grounds of the Billerica House of Correction. Incoming vehicles shall be searched for the purpose of detecting and interdicting contraband. Outgoing vehicles, including official vehicles, shall be searched for the purpose of preventing escapes. These searches shall be performed at the modular vehicle trap (trap #2) and at checkpoint.

### .13    Visitor Searches

All persons entering either correctional facility shall be subject to search. Visitors shall be searched as proscribed by Policy and Procedure 483 - Visiting.

### .14    Documentation of Searches

In order to monitor compliance with the facility search plan and to avoid unnecessary repetitive searches of the same locations or cells all area searches shall be recorded. The Security Department shall maintain such records which shall contain the date of the search, the area which was searched, the name of the officer who conducted the search and the result of the search including the type of contraband recovered if any.

### .15    Disposition of Contraband

1.    All contraband recovered during searches shall be confiscated, labeled and forwarded to the Security Department. An Incident Report shall be written which describes the contraband and the location at which it was found. If the contraband can reasonably be associated with an inmate a Disciplinary Report shall also be written. Continuity of evidence shall be maintained by all staff who find or receive contraband items.

2.    The Chief of Security may order the destruction of stored contraband or the removal of contraband to another agency such as the Massachusetts State Police in the case of controlled substances. Certain contraband such as weapons made by inmates or drug paraphernalia may be transferred to the Training Department for instructional purposes. All, such destruction or transfer of contraband shall be documented by the Security Department including the date, authorization, description and amount of the contraband and the receiving agency if any.

### .16    Crime Scene Procedures

1.    Whenever an incident occurs that may possibly result in a criminal compliant or prosecution, the Shift Commander shall notify the Deputy Superintendent or the Duty Officer. The Deputy Superintendent shall determine whether the site of the incident shall be treated as a crime scene. If so, the Deputy Superintendent shall notify the Chief of Security and the Superintendent.

2.    The site shall be secured and searched at the direction of the Chief of Security or designee. The crime scene search and investigation shall be conducted in such a manner so as to ensure the preservation of evidence for the Commonwealth.

3.    The Chief of Security or designee will designate evidence officers who shall control and record access by all persons to the site as directed by the Chief of Security. Evidence officers shall also exercise control of all activity, including the recording, marking, handling, removal and storage of physical evidence including controlled substances or other contraband.

4.    The Chief of Security shall ensure that Security Department staff and other correctional staff are familiar with the appropriate methods of handling and storage of contraband and controlled substances.

## .17   Training

Officers shall receive training in search techniques in order to increase their ability to detect contraband and to conduct searches in such a way as not jeopardize their own safety.



*The Commonwealth of Massachusetts*
*Middlesex Sheriff's Office*

James V. DiPaola
Sheriff

# Policy and Procedure 525H

# Urine Surveillance

### Table of Contents

.01    Date Revised
.02    ACA Standard Referenced
.03    Policy
.04    Applicability
.05    Definitions
.06    Authorization for Testing
.07    Procedures for Collecting Urine Samples
.08    Procedures for Testing Using the Cobas Mira Plus Analyzer™
.09    Procedures for Testing Using the Ontrak Testcup™
.10    Results, Confirmation and Reporting of the Cobas Mira Plus Analyzer™
.11    Seventy-Two Hour Investigations
.12    Training Requirements
.13    Maintenance Requirements for the Cobas Mira Plus Analyzer™

### .01    Date Revised

The revision date of this policy is August 10, 2001.

### .02    ACA Standard Referenced

This policy is consistent with Adult Local Detention Facility standard 3-ALDF-4E-19-2..

### .03    Policy

It is the policy of the Middlesex Sheriff's Office that all inmates committed to the Billerica House of Correction shall be subject, both randomly and for cause, to urine surveillance for the purpose of detecting the use of drugs.

### .04    Applicability

This policy applies to the Billerica House of Correction.

### .05    Definitions

1.    Cobas Mira Plus Analyzer™ - The primary method by which the Middlesex Sheriff's Office tests urine samples for drugs of abuse.

2.    Institution number - The number assigned to each inmate upon commitment to the facility.

3.    LabDAQ 2000 - The data management system, essentially a personal computer, which stores the results of tests performed on the Cobas Mira Plus Analyzer™.

4.    Master operator - An officer appointed by the Superintendent who has been trained by Roche Diagnostic Systems in the operation of the Cobas Mira Plus Analyzer™ and certified to train and qualify other employees of the facility.

5.    OnTrak Testcup™ - The alternate method by which the Office tests urine samples for cocaine, THC, morphine and amphetamine when Mira Plus is unavailable or when sampling in the community is required.

6.    Operator - An officer appointed by the Superintendent who has been trained and qualified to operate the Cobas Mira Plus Analyzer™.

7.    Specimen I. D. - The accession number automatically assigned to a urine sample by the LabDAQ.

8.    Specimen Report - a record of the urine screen test containing information on each specific test and its result.

9.  Standard Drug Screen - a urine screen using the Cobas Mira Plus Analyzer™ to test for the following drugs:

    a.    cannabinoid
    b.    cocaine
    c.    opiate
    d.    barbiturates
    e.    benzodiazepine
    f.    amphetamine.

10.  Urine Specimen - the amount of urine taken from an inmate sufficient to conduct urine surveillance, specifically 60 mL. This amount is sufficient for both the Cobas Mira Plus Analyzer™ and for the OnTrak Testcup™.

11.  Urine Surveillance - a procedure to monitor an inmate's drug usage.

## .06    Authorization for Testing

1.  Urine testing may be authorized by the following:

    a.    Superintendent
    b.    Assistant Superintendent
    c.    Deputy Superintendent
    d.    Shift Commander
    e.    Unit Manager
    f.    Facility Security Officer or
    g.    Director of the Electronic Monitoring Program or designee.

2.  The person ordering the urine surveillance shall ensure that the officer assigned to collect the specimen submits a *Communication Report* containing the following information:

    a.    the name of the person who authorized the urine testing
    b.    the name of officer assigned to collect the specimen
    c.    the full name and institution number of the inmates being tested
    d.    the housing assignment of each inmate being tested and
    e.    any information relative to the sample taking process including, but not limited to:

        *i.*    refusals to submit a sample
        *ii.*    attempts to alter a sample and
        *iii.*    other relevant security issues.

**.07    Procedures for Collecting Urine Samples**

1.    Location for collecting urine samples:

Inmates assigned to CWP or Work Release shall be held in a secure area for the collection of samples and to await the results. Samples should be tested immediately. The inmates shall remain in the secure area until the result is obtained.

2.    Preliminary procedures:

The officer assigned to collect urine samples from inmates for the purpose of urine surveillance shall adhere to the following procedures:

   a.    Samples shall be collected only as authorized by 525H.06.

   b.    The officer collecting the samples shall be the same sex as the inmate providing the sample. The Cobas Mira Plus Analyzer™ operator shall not be assigned to collect samples.

   c.    Samples shall be taken in an area which affords the inmate privacy.

   d.    The officer shall wear protective gloves while collecting and transporting samples.

   e.    The officer shall properly complete, date and sign a *Urine Surveillance Sign Off Form*. The names, institution numbers and housing units of all inmates to be tested shall be listed on this form. The officer shall verify, by means of the computer or by a census, that the correct institution number has been entered for each inmate. No entry shall be made in the shaded column of this form. Any questions regarding the completion of the *Sign Off Form* shall be directed to the Urine Surveillance Officer.

   f.    The officer shall obtain one sample cup for each inmate to be tested. He shall label, in ink, each cup with the institution number of each inmate to be tested as listed on the *Sign Off Form*.

2.    Sampling Procedures:

    a.    The officer shall escort the inmate to the area where the sample is to be taken.

    b.    The inmate shall be strip-searched.   The inmate shall be required to rinse and dry his hands. The officer shall inspect the inmate's hands and fingernails for possible contaminants.

    c.    The officer shall give to the inmate the sample cup labeled with that inmate's institution number.  The officer shall verify the correctness of the institution number by reference to the ID bracelet or card worn by the inmate.

    d.    The officer will order the inmate to produce a urine sample. At this time the inmate shall be informed that he must produce an adequate sample within 2 hours.  He shall be informed that failure to do so will result in a *Disciplinary Report*.

    e.    The officer shall remain with the inmate.  The officer must directly observe the passage of urine into the sample cup.

    f.    After the sample is produced the inmate shall be directed to secure the cap onto the cup.  The inmate shall then be directed to sign his name on the *Sign Off Form*.  This shall afford the inmate an opportunity to observe that his urine sample is, in fact, labeled with the same institution number associated with his name.

3.    Procedures After Samples are Obtained:

    a.    The same officer shall personally deliver the sample or samples along with the *Sign-Off Form* to the urine surveillance laboratory located in the Infirmary of the Main Building. Samples that will not be tested within 8 hours shall be placed in the refrigerator.  Samples must be safe guarded and treated as evidence. The name of the officer accepting the samples shall be recorded on the *Sign-Off Form*.

    b.    The officer shall write and submit to the Shift Commander a *Disciplinary Report* whenever an inmate:

        i.    Refuses to produce a urine sample

ii.     Fails to produce an adequate sample within 2 hours

iii.    Contaminates or attempts to contaminate a sample or otherwise tampers with or attempts to tamper with any sample or

iv.     Refuses to comply with any legitimate order.

## .08    Procedures for Testing Using the Cobas Mira Plus Analyzer™

1.  All such tests shall be performed by a qualified Cobas Mira Plus Analyzer™ operator employing the methods approved and taught by Roche Diagnostic Systems.

2.  The test shall be set up to perform a standard drug screen unless other testing requirements are specified by the person authorizing the test. The Cobas Mira Plus Analyzer™ shall be recalibrated at least once a week.

3.  The operator shall load the racks with the samples to be tested. As many as 60 samples may be programmed.

4.  The operator shall enter each inmate's institution number into the LabDAQ file. The operator shall ensure that the specimen I. D. and the rack numbers match. LabDAQ automatically assigns consecutive specimen I. D. numbers as the institution numbers are entered. All data is downloaded from the Cobas Mira Plus Analyzer™ to the LabDAQ 2000 data base.

5.  The operator shall then activate testing.

6.  At the completion of the testing the operator shall access the test review file of LabDAQ 2000 and accept or reject the test results. If a positive test is accepted the operator shall take action as specified by 525H.10.

## .09    Procedures for Testing Using the OnTrak Testcup™

1.  The operator shall remove the test cup from the storage bag. The cup must be used within 8 hours after removal from the bag. The operator shall label, in ink, the cup with the institution number of the inmate to be tested.

2.  The urine should be tested at body or room temperature.

3.  The operator shall close the lid by turning it to the *test* position.

4.  The operator shall tilt the cup toward the front label until the specimen covers approximately ¾ of the cap. The operator shall hold the cup in this position for 3 to 5 seconds. The cup shall then be returned to the upright position.

5.  After 5 minutes but no later than 30 minutes the operator shall remove the cover label and read the result.

6.  A negative result is indicated by the presence of a blue band anywhere in the test result window. A positive result (drug present in sample at or above the cut-off level) is indicated by the lack of a blue band in the test result window. The window will appear as a white (+) sign.

7.  If positive, the sample cup containing the specimen shall be forwarded to the urine surveillance laboratory as OnTrak Testcup™ results must be confirmed as specified by 525H.10.

## .10    Results, Confirmation and Reporting of the Cobas Mira Plus Analyzer™

1.  The results of all tests shall be stored by LabDAQ 2000. Hard copies of all test results shall be maintained for a period of 2 years.

2.  Whenever a positive test result is obtained the operator shall confirm that result by performing a second Cobas Mira Plus Analyzer™ test on that sample. In the event that a second test cannot be performed at this time, the sample shall be refrigerated or frozen. The operator shall notify both the Shift Commander and the person who authorized the testing. The Shift Commander shall issue a *Notice of 72 Hour Investigation* pending confirmation.

3.  If an initial positive test result is not confirmed, the inmate shall be returned to his prior classification and housing status.

4.  Whenever a positive test result is confirmed the operator shall write a *Disciplinary Report* to which the individual specimen report shall be attached.

5.  All samples which have tested positive shall be frozen and saved for a period of 14 days.

6.  At the conclusion of drug testing for the shift, the operator shall ensure that the following information has been entered into LabDAQ 2000:

    a.  the inmates' names and institution numbers
    b.  the specimen I. D. numbers
    c.  the inmates' housing units
    d.  the date of testing
    e.  the name of officer taking urine samples
    f.  the name of the test operator
    g.  the specific tests performed
    h.  the results initial tests and
    i.  the results of confirmation tests.

7.  The designated master operator shall submit to the Superintendent and to the Standards Manager weekly and monthly statistical reports of all findings, detailing the total number of tests, positive results identified by type of drug and the percentage of positive results listed by housing unit.

### .11    Seventy-Two Hour Investigations

1.  Whenever urine testing is initiated but is not completed within 4 hours, the person who authorized the testing or the Shift Commander shall temporarily reclassify all inmates subject to this testing to medium security. He or she shall issue to each a *Notice of 72 Hour Investigation*. Medium security inmates shall remain in medium until the completion of the testing. Less than medium security inmates shall be temporarily classified to a medium security housing unit until completion of the testing.

2.  Incomplete testing shall include situations in which:

    a.  an initial positive result has been obtained but the confirmation test cannot be perform immediately or
    b.  a urine sample has been collected but the initial test cannot be performed immediately.

### .12    Training Requirements

1.  All master operators shall be trained by Roche Diagnostic Systems in the use of the Cobas Mira Plus Analyzer™.    After successfully completing this course and passing the required test master operators are certified to train other operators at the facility.

2.    All operators shall be certified by a master operator and shall pass a written test administered by Roche Diagnostic Systems.

3.    All operators using the OnTrak Testcup™ shall be trained by a master operator in its use following the published guidelines of the manufacturer, Roche Diagnostics.

4.    The Training Department shall maintain on file copies of the qualification certificates of all operators and master operators.

## .13    Maintenance Requirements for the Cobas Mira Plus Analyzer™

All operators shall perform the following maintenance on the Cobas Mira Plus Analyzer™:

1.    Daily Maintenance:

    a.    Check printer paper supply.
    b.    Inspect sample needle/reagent probe.
    c.    Prime the system.
    d.    Replace reagent tip cleaner.
    e.    Load an adequate supply of cuvette segments.
    f.    Perform needle/tube clean at the end of the shift.

2.    Weekly Maintenance

    a.    Clean the tube holder.
    b.    Perform P150 and P250 precision test.

3.    Monthly Maintenance

    a.    Replace the reagent probe.
    b.    Change the wash tower foam sponge.
    c.    Replace the syringe plunger tips.

4.    Six Month Maintenance Procedures

    a.    Replace the sample needle assembly.
    b.    Clean the instrument.
    c.    Replace the diluent filter.